[No. G034479. Fourth Dist., Div. Three. Oct. 31, 2005.]

LIFE CARE CENTERS OF AMERICA, Plaintiff and Respondent, v. CALOPTIMA, Defendant and Appellant.

## COUNSEL

Foley & Lardner, James N. Godes, Susanne C. Washington and Kenneth S. Klein for Defendant and Appellant.

Sanders, Collins & Rehaste, Rita A. Rehaste, Roberta L. Cutsinger and Brian E. Edwards for Plaintiff and Respondent.

Hooper, Lundy & Bookman, Mark E. Reagan, Scott J. Kiepen and Felicia Y. Sze for the California Association of Health Facilities as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**ARONSON, J.**—Defendant CalOptima is a county organized health system (COHS) providing services to Medi-Cal beneficiaries through contracts with various health care providers. Under its prior authorization policy, CalOptima requires long-term care providers to submit treatment authorization requests (TAR's)[1] within 21 days of the patient's admission. This case arose out of six TAR's submitted by plaintiff Life Care Centers of America, doing business as La Habra Convalescent Hospital (Life Care), to defendant CalOptima seeking payment for patients admitted to Life Care's facility. CalOptima refused to pay the full amount requested because Life Care failed to submit the TAR's within the 21-day deadline. Life Care filed a petition for peremptory writ of mandate, requesting the trial court to require CalOptima to make full payment on each of the six TAR's. The trial court denied CalOptima's request for judgment, granted Life Care's writ petition and awarded Life Care attorney fees. CalOptima appeals each of these rulings.

We conclude Life Care failed to prove that CalOptima's enforcement of its 21-day submission deadline was arbitrary, capricious, unsupported by substantial evidence, or illegal. The Legislature granted COHS's, such as

---

[1] TAR's submitted to CalOptima are currently referred to as authorization request forms (ARF's). Because much of the evidence submitted refers to the submittals as TAR's, we adopt the same designation for clarity.

CalOptima, broad flexibility in the manner they provide services to Medi-Cal beneficiaries. Rather than requiring strict adherence to specific statutory mandates, the Legislature has permitted these organizations to negotiate the terms and conditions of their contract with the state. Because CalOptima's contract with the state does not prohibit claim submission deadlines, CalOptima was free to adopt and apply a 21-day submission policy as part of its utilization controls.

We therefore reverse the trial court's orders and instruct the trial court to enter judgment in favor of CalOptima.

I

FACTUAL AND PROCEDURAL BACKGROUND

Established under title XIX of the Social Security Act (42 U.S.C. § 1396 et seq.), the federal Medicaid program provides funds to the states to defray the cost of medical care for qualified low-income persons. The California Medical Assistance (Medi-Cal) program implements Medicaid in California. (*Blue v. Bonta* (2002) 99 Cal.App.4th 980, 985 [121 Cal.Rptr.2d 483] (*Blue*); Welf. & Inst. Code, §§ 14000–14198.2.)[2] The Department of Health Services (DHS) is responsible for administering the state's Medi-Cal program. (*Blue,* at p. 985.)

Medi-Cal healthcare payments are disbursed in two ways. The first is a "fee for service" process whereby DHS determines whether the healthcare services were "medically necessary" and, if so, pays the service providers directly. (*Blue, supra,* 99 Cal.App.4th at p. 986.) When DHS pays service providers directly, it follows a schedule of benefits (§ 14132), many of which are subject to "utilization controls," such as prior authorization by a DHS consultant, a postservice prepayment audit, a postservice postpayment audit, a limitation on the number of services, and a separate review of the services provided. (§ 14133.)

Alternatively, DHS administers Medi-Cal through various managed care models operated by public and private entities under contract. (§§ 14087.5–14087.95.) The purpose of these managed care programs is to " 'reduce costs, prevent unnecessary utilization, reduce inappropriate utilization, and assure adequate access to quality care for Medicaid recipients.' " (Rivera, *A Future For Medicaid Managed Care: The Lessons of California's San Mateo County* (1995) 7 Stan. L. & Poly. Rev. 105,

---

[2] All statutory references are to the Welfare and Institutions Code unless otherwise noted.

111–112.) One legislatively authorized managed care model is a COHS. (§§ 14087.5–14087.10.) The COHS is paid on a fixed, or "capitated" basis for each Medi-Cal recipient, regardless of the level of services used by each recipient. In turn, the COHS assumes the financial risk of its members' care and pays health service providers directly. (§ 14087.6.)

The Orange County Organized Health System, doing business as CalOptima, was created by ordinance in 1993 and commenced operations in 1995. CalOptima currently operates under a contract with DHS executed in October of 1999.[3] Under CalOptima Policy No. GG 1800, effective June 1998, long-term care providers seeking reimbursement must submit a TAR within 21 calendar days of a qualified patient's admission to the provider's facility. If the TAR is timely submitted to CalOptima, reimbursement is retrospective to the date of admission. If received after the 21-day deadline, reimbursement is made only as of the date of receipt.

Life Care submitted six untimely TAR's to CalOptima, ranging from 26 to 205 days after admission, with an average of 71 days. Following its policy, CalOptima denied a portion of the requested reimbursement and rejected Life Care's subsequent objections. Life Care filed a petition for writ of mandate under Code of Civil Procedure section 1085, requesting the trial court to direct CalOptima to approve the late TAR's for reimbursement as of the actual admission dates.

CalOptima filed a motion for judgment under Code of Civil Procedure section 1094.[4] At the first hearing held on the motion, the trial court continued the matter for further briefing and requested the parties provide additional evidence. In particular, the court instructed CalOptima to explain (a) which statutory mandate supported its application of the 21-day rule; (b) how its decision to deny retrospective approval was supported by substantial evidence; (c) how the 21-day rule promoted quality care and cost

---

[3] In two separate requests, CalOptima seeks judicial notice of (a) an April 12, 2001 DHS memorandum regarding "AB2877 Impact on Managed Care"; (b) excerpts from CalOptima's Long Term Care Provider Manual, Authorization Instructions, November 2001; (c) excerpts from the contract between DHS and CalOptima dated October 1, 1999; and (d) CalOptima Policy No. GG 1800, effective June 1, 1998, "TAR Process and Criteria for Admission to, Continued Stay in, and Discharge from a Skilled Nursing Facility." We grant each of these requests. (See Evid. Code, § 452, subd. (c).)

[4] Code of Civil Procedure section 1094 provides, in pertinent part: "If a petition for a writ of mandate . . . presents no triable issue of fact or is based solely on an administrative record, the matter may be determined by the court by noticed motion of any party for a judgment on the peremptory writ."

efficiency; and (d) what was the rational connection between the 21-day rule and CalOptima's denial of benefits for Medi-Cal eligible patients. The court asked Life Care to explain its opposition to CalOptima's motion and to state whether the administrative record was complete. The court also asked Life Care to supply evidence of its attempts to comply with the 21-day rule and evidence supporting its contention that no other county applies a similar time limit.

At the continued hearing, the trial court denied CalOptima's motion and granted Life Care's petition. Although the trial court did not issue a statement of decision, the court made the following observations at the hearing: "CalOptima fails to establish any steps taken by CalOptima when it received the late TAR/ARF's to determine whether payment should be made in spite of the late submission, or if not, why this type of inquiry was not made. [¶] CalOptima provides no evidence to support the statutory mandate that it is to deny reimbursement if certain forms are not completed and received in 21 days. [¶] The fact that CalOptima has saved the state millions does not establish a rational relationship between the 21-day rule and the statutory mandate. CalOptima has no evidence that the denial of these claims was based on lack of eligibility or that the care provide[d] was not medically necessary. [¶] These denials were administrative. CalOptima has provided no evidence of any grievance procedure or whether there are [exceptions] to this 21-day rule." The court also indicated Life Care could recover its attorney fees if it filed a separate motion.

Life Care subsequently filed a motion for attorney fees under both Code of Civil Procedure section 1021.5 and Government Code section 800. The trial court denied fees under section 1021.5, but granted the motion under section 800.

II

STANDARD OF REVIEW

██ An agency acts in a legislative or quasi-legislative capacity when it adopts a rule applicable to all future cases and acts in an adjudicative capacity when determining an individual's rights under existing law with regard to a specific fact situation. (*William S. Hart Union High School Dist. v. Regional Planning Com.* (1991) 226 Cal.App.3d 1612, 1625 [277 Cal.Rptr. 645].) Life Care's petition does not expressly seek to overturn CalOptima's 21-day rule, but requests reimbursement for healthcare services provided to six specific patients retroactive to the date Life Care first rendered services. Thus, Life Care is challenging adjudicatory acts taken by CalOptima.

■ Life Care's writ petition sounds in ordinary mandate under section 1085 of the Code of Civil Procedure, rather than administrative mandate under section 1094.5. " 'Ordinary mandate is used to review an adjudicatory decision when an agency is not required to hold an evidentiary hearing. [Citation.] The scope of review is limited, out of deference to the agency's authority and presumed expertise . . . .' [Citation.] We apply the substantial evidence test to the trial court's factual findings, but exercise independent judgment on legal issues such as the interpretation of statutes. [Citation.]" (*Johnston v. Sonoma County Agricultural Preservation & Open Space Dist.* (2002) 100 Cal.App.4th 973, 983–984 [123 Cal.Rptr.2d 226].) Consequently, we must affirm CalOptima's decision to deny full reimbursement to Life Care unless CalOptima acted arbitrarily or capriciously or its decision lacks evidentiary support. (*Id.* at p. 985.)

## III

### DISCUSSION

A. *CalOptima Failed to Demonstrate Life Care Had an Adequate Administrative Remedy*

CalOptima contends Life Care failed to exhaust its administrative remedies and therefore could not seek relief from the courts. We disagree.

■ Where an adequate internal remedy is provided by a public agency or private organization, a claimant must first utilize that remedy before filing suit. Not all internal remedies, however, are adequate. To constitute an internal or administrative remedy requiring exhaustion before filing suit, " '[t]here must be "clearly defined machinery" for the submission, evaluation and resolution of complaints by aggrieved parties.' " (*Payne v. Anaheim Memorial Medical Center, Inc.* (2005) 130 Cal.App.4th 729, 740 [30 Cal.Rptr.3d 230].) This procedure must include adequate notice of the proposed administrative action, a fair right to be heard, and a decision rendered by an impartial trier of fact. (*Id.* at pp. 740–741.)

CalOptima fails to outline what internal remedies it provided to Life Care, or to offer any evidence of their existence. We are therefore unable to determine whether these remedies are adequate to require exhaustion before resort to the court. Consequently, we reject CalOptima's contention regarding exhaustion.

B. *The Trial Court's Order Granting Life Care's Writ Petition Lacks Legal and Factual Support*

 1. CalOptima's 21-day Requirement Does Not Violate Section 14133.05

The primary focus of Life Care's writ petition is the contention that CalOptima's 21-day submission requirement violates subdivision (a) of section 14133.05, which provides: "Notwithstanding any other provision of law, a request for a treatment authorization received by the department shall be reviewed for medical necessity only."[5] Life Care contends section 14133.05 not only bars DHS from rejecting untimely TAR's, but also bars a COHS, such as CalOptima, from doing so. We disagree.

 Neither of the parties cites any case authority regarding this issue. CalOptima, however, notes both the Attorney General and DHS have considered this issue and concluded section 14133.05 applies only to TAR review by DHS, and not TAR review by a COHS. (See 86 Ops.Cal.Atty.Gen. 108 (2003).) Although the ultimate responsibility for construing a statute lies with the courts, opinions by the Attorney General are entitled to "great weight." (*Johnson v. Capital One Bank* (2004) 120 Cal.App.4th 942, 945–946 [15 Cal.Rptr.3d 917].) In the absence of controlling authority, an Attorney General opinion may be persuasive because we presume the Legislature is aware of the opinion, and would have amended the statute if it disagreed. (*Ibid.*)

 In a similar vein, we may consider an administrative agency's interpretation if the statute is susceptible to more than one reasonable interpretation and the agency's view is reasonably contemporaneous with the enactment of the statute. (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1011–1012 [32 Cal.Rptr.3d 89, 116 P.3d 550].) In the present situation, DHS provided its interpretation of section 14133.05 in April 2001, just over nine months after the section became effective in July 2000. Accordingly, we also consider its interpretation.

 In essence, both the Attorney General and DHS recognize that a COHS operates under a different statutory scheme, found in sections 14087.5–14087.93, than the operative statutes governing DHS. (86

---

[5] Although Life Care based its writ petition almost entirely on the contention CalOptima's 21-day requirement violated section 14133.05, Life Care now argues that the trial court did not base its decision on this issue, and therefore its resolution is unnecessary to affirm the trial court's orders. Nevertheless, Life Care also argues on appeal that the 21-day rule violates section 14133.05.

Ops.Cal.Atty.Gen., *supra*, at p. 110.) Specifically, section 14087.6 provides a county with broad flexibility in the manner it provides services to Medi-Cal beneficiaries. (See 86 Ops.Cal.Atty.Gen., *supra*, at p. 110.) As DHS notes, a COHS operates under a contract negotiated by the California Medical Assistance Commission on behalf of the state. (§ 14087.5, subd. (a).) Rather than operating under specific statutory mandates, the county is bound by the rules, terms, and conditions negotiated under the contract. (§ 14087.55.) In addition, the standard contracts require the COHS to develop, implement and maintain utilization management controls. Thus, as DHS concluded, unless the contract expressly incorporates section 14133.05 or otherwise proscribes timeliness requirements, a COHS is free to set deadlines for the submission of reimbursement requests.

 In our own review of the statute, we apply well-established rules of construction. " 'We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.' [Citation.] If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls." (*Fitch v. Select Products Co.* (2005) 36 Cal.4th 812, 818 [31 Cal.Rptr.3d 591, 115 P.3d 1233].) As noted above, section 14133.05 provides: "(a) Notwithstanding any other provision of law, a request for a treatment authorization received *by the department* shall be reviewed for medical necessity only." (Italics added.) Section 14067 defines the term "department" to mean DHS. Because CalOptima, not DHS, receives the TAR requests, the statute on its face appears inapplicable.

Life Care counters that entities such as CalOptima did not exist when the Legislature originally enacted section 14067 in 1965, and last amended it in 1977, a period when managed care was "in its infancy." The implication is that if the Legislature were to enact section 14067 today, it would expand its definition of "department" to include COHS entities. But the Legislature enacted the provision at issue, section 14133.05, in 2000, well after CalOptima and a number of other Medi-Cal health-management organizations began operation. If the Legislature wished to include these organizations within the scope of section 14133.05, it certainly could have done so.

Life Care also contends CalOptima "would probably not argue" it is excluded from other code sections referring to the "department," including section 14124.90, designating the "department" as the "payor of last resort," and section 14043.3, requiring reimbursement of Medi-Cal funds if material information is not reported or reported falsely "*to the department.*" Although CalOptima may at some point wish to avail itself of the protections of these statutes expressly benefiting only the "department," no evidence was presented that it had done so. We cannot invoke principles of judicial estoppel to

prevent a party from taking one legal position simply because it might take an opposite position in the future.

Moreover, viewing sections 14124.90 and 14043.3 as inapplicable to CalOptima does not place it in a precarious position. As for section 14124.90, the provision simply confirms the Legislature's intent to follow federal law, which establishes Medi-Cal as the last source of funds used. (See 42 U.S.C. § 1396a(a)(25).) This intent is fulfilled as to a COHS not by statute, but by contract. For example, in its contract with DHS, CalOptima is commanded to "coordinate benefits with other programs or entitlements, recognizing the Other Health Coverage as primary and Medi-Cal as the payor of last resort." The contract describes in detail how this policy is to be accomplished. In turn, CalOptima's Policy No. GG 1800, binding upon Life Care and other providers, establishes that "Medi-Cal is always the last source of reimbursement for residents in [a skilled nursing facility]."

Similarly, CalOptima has broad discretion in negotiating reimbursement terms with care providers. Certainly, CalOptima has the opportunity to set by contract with its health care providers refund policies similar to that embodied in section 14043.3.

Life Care further argues that different rules and policies applicable to residents of different counties produce absurd outcomes. For example, a provider may receive reimbursement for services rendered to a Los Angeles County resident, but not to a resident of Orange County. Life Care contends the Legislature could not have intended this result. We disagree. The Legislature has enacted statutes authorizing a wide variety of managed care models that have been implemented throughout the state, including "Two-Plan Model managed care plans" under article 2.7 (§ 14087.3 et seq.),[6] geographic managed care plans under article 2.9 (§ 14089 et seq.), and county operated health systems under article 2.8 (§ 14087.5 et seq.). The purpose of these various models is to encourage the development of innovative and cost-effective health care delivery systems.

Amicus Curiae California Association of Health Facilities (CAHF) contends CalOptima is a legal subdivision of the state and an agent of DHS.[7]

---

[6] Each article referenced is found in chapter 7 of division 9 of part 3 of the code.

[7] We deny CalOptima's objection to and motion to strike CAHF's amicus curiae brief and motion to disqualify Hooper, Lundy & Bookman, Inc. (HLB Firm), based on the HLB Firm's previous representation of CalOptima. CalOptima filed no objection to CAHF's application to file an amicus curiae brief, despite knowing that the HLB Firm represented CAHF, and therefore waived any objection to the amicus curiae brief. We also deny CalOptima's request to disqualify the HLB firm from further participation in this matter. Whatever the status of the attorney-client relationship between CalOptima and the HLB Firm at the time the amicus

Relying on the axiom that a principal cannot convey to an agent authority greater than that possessed by the principal itself, CAHF argues that because DHS cannot deny a TAR based solely on untimeliness, CalOptima cannot gain the right to do so by contracting with DHS.

What CAHF fails to acknowledge, however, is that CalOptima's right to negotiate payment terms does not derive solely from its status as a political subdivision or from DHS as its purported agent. Indeed, CalOptima's contract with DHS expressly states that CalOptima and its personnel "act in an independent capacity and not as officers or employees or agents of State of California." As a COHS, CalOptima is also acting under express statutory authority. Specifically, section 14087.6 confers upon counties operating a COHS broad authority to determine the manner in which it reimburses care providers, as follows: "A county that has contracted for the provision of services pursuant to this article may provide the services directly to recipients, or arrange for any or all of the services to be provided by subcontracting with primary care providers, health maintenance organizations, insurance carriers, or other entities or individuals. *The subcontracts may utilize a prospectively negotiated reimbursement rate, fee-for-service, retainer, capitation, or other basis for payment.* The rate of payment established under the contract shall not exceed the total per capita amount that the department estimates would be payable for all services and requirements covered under the contract if all these services and requirements were to be furnished Medi-Cal beneficiaries under the Medi-Cal fee-for-service program." (Italics added.)

Thus, the Legislature granted COHS's the authority to negotiate a broad range of payment terms with health care providers, subject only to the restriction that the amount payable not exceed the estimate under the Medi-Cal fee-for-service program. Of course, this authority is not completely unfettered. DHS could, if it wished, contractually restrict a COHS's ability to set a timeliness requirement on TAR's submitted by healthcare providers. (See § 14087.55, subd. (a).) Moreover, DHS is required to monitor each COHS as to the level and quality of services rendered, the costs incurred, and compliance with federal law. (§ 14087.8.) Absent intervention by DHS, however, nothing prevents a COHS from negotiating with a healthcare provider a deadline to submit TAR's.

In short, neither the language of section 14133.05 nor the Legislature's apparent purposes in creating the statutory scheme implementing the

---

curiae application was filed, it is now clear the relationship has ended. Because CalOptima does not allege the HLB Firm has obtained any confidential knowledge or information that could be used in connection with this matter, there is no basis to disqualify the HLB Firm.

Medi-Cal program compels the conclusion that CalOptima is prevented from enforcing a timeliness requirement on TAR's.

2. Cases Applying Civil Code Section 3275 Have Been Abrogated by Statute

Relying on *Valley View Home of Beaumont, Inc. v. Department of Health Services* (1983) 146 Cal.App.3d 161 [194 Cal.Rptr. 56] (*Valley View*), and *Lauderdale Associates v. Department of Health Services* (1998) 67 Cal.App.4th 117 [78 Cal.Rptr.2d 802] (*Lauderdale*), Life Care contends providers may obtain reimbursement for services rendered to Medi-Cal patients despite untimely TAR's. In both cases, DHS enforced timeliness requirements similar to the 21-day rule of CalOptima, and denied reimbursement for late TAR's. In each case, the court required full reimbursement of the late TAR submissions based upon Civil Code section 3275, which provides: "Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty."

Life Care's reliance on these cases is misplaced. Shortly after the decision in *Lauderdale,* the Legislature enacted section 14018.5, which provides: "Notwithstanding any other provision of law, Section 3275 of the Civil Code does not apply to Medi-Cal reimbursement or prior authorization." Although Life Care is correct that no case law currently exists evaluating the effect of section 14018.5 on *Valley View* and *Lauderdale*, the effect of this legislation nonetheless is unmistakable: Section 14081.5 abrogates both cases.

 The passage of section 14081.5 demonstrates the Legislature's disapproval of judicial efforts to circumvent management controls on Medi-Cal reimbursement. Thus, we also reject the request of amicus curiae CAHF to extend the equitable principle of quantum meruit to the present situation.

3. Life Care Has Failed to Demonstrate CalOptima's Actions Were Arbitrary, Capricious or Lacking in Evidentiary Support

CalOptima's adjudicatory decision to deny reimbursement to Life Care is supported by evidence that is not only substantial, but undisputed. As the trial court recognized and both parties conceded, the facts underlying CalOptima's denial of full reimbursement are not in dispute. Specifically, there is no dispute that CalOptima's established policies require submission of TAR's within 21 days of the commencement of health services, nor is there any dispute that Life Care failed to comply with this requirement.

Life Care, however, contends application of the 21-day requirement to its TAR's was arbitrary and capricious, and echoes the trial court's observation that CalOptima failed to provide evidence demonstrating how the 21-day requirement "promote[s] quality care and cost efficiency." CalOptima counters that the trial court improperly reversed the burden of proof and that Life Care failed to meet its burden of demonstrating that application of the 21-day rule to the six tardy TAR submissions was arbitrary, capricious, or lacking in evidentiary support. We agree with CalOptima.

■ In promulgating a particular regulatory standard, we assume the agency has appropriately weighed the relevant facts and policy considerations. Accordingly, an agency's regulations carry with them a strong presumption of validity. (*Western States Petroleum Assn. v. State Dept. of Health Services* (2002) 99 Cal.App.4th 999, 1007 [122 Cal.Rptr.2d 117].) As Life Care acknowledges, it had the burden to demonstrate the invalidity of CalOptima's 21-day rule.

Regarding the specific denials at issue here, Life Care has provided no evidence demonstrating why CalOptima should not apply the 21-day rule. The evidence submitted merely establishes that a Life Care clerical worker with "personal problems" failed to enter the required patient information into the computer. Life Care does not contend it cannot meet the 21-day rule, or that CalOptima has applied the rule in an arbitrary or capricious manner. For example, Life Care has submitted no evidence the 21-day rule has not been applied uniformly or has been used to punish certain providers.

■ To the extent Life Care seeks to challenge the 21-day rule in its entirety, the meager evidence Life Care submitted is woefully inadequate. On this point, Life Care presented evidence that the Santa Barbara Regional Health Authority has a six-month TAR submission requirement, after which a penalty is imposed, and the Central Coast Alliance for Health, serving residents of Santa Cruz and Monterey Counties, has no TAR submission deadline at all. Life Care presented no evidence regarding any similarities between CalOptima and these agencies, or whether these agencies operate under the same statutory scheme. Life Care failed to show whether these two agencies operated in a cost-effective manner, or met patient care needs. Indeed, Life Care does not even provide details on the size of the penalty assessed by the Santa Barbara Regional Health Authority for a late TAR submission, and is completely silent as to what utilization controls have been implemented in other counties. In short, an agency should not be forced to justify its complex policy decisions simply because another agency does things differently.

## IV

### DISPOSITION

The order denying CalOptima's motion for judgment and orders granting Life Care's petition for peremptory writ of mandate and attorney fees are reversed. The trial court is directed to enter judgment on the writ petition in favor of CalOptima. CalOptima is entitled to its costs on appeal.

Sills, P. J., and Bedsworth, J., concurred.