Filed 2/28/14

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| TIM KEFFELER et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> PARTNERSHIP HEALTHPLAN OF CALIFORNIA, <br><br> Defendant and Respondent. | A135536 <br><br> (Alameda County <br> Super. Ct. No. RG12614261) |

## I. INTRODUCTION

Petitioners own pharmacies in Marin and Yolo Counties and used to be paid by the state on a fee-for-service basis for dispensing prescription drugs to Medicaid beneficiaries. However, in late 2010, the state required Medicaid eligible seniors and persons with disabilities to be enrolled in managed health plans. As a result, in 2011, petitioners became part of Partnership Health Plan of California's managed care network of pharmacies. Petitioners claim the rates they are paid by Partnership are so low they are being driven to the brink of insolvency. They contend Partnership's failure to take their costs into account violates the "quality of care" and "equality of access" provisions of Section 1902(a)(30)(A) of the Social Security Act (hereafter Section 30(A)). (42 U.S.C. § 1396a, subd. (a)(30)(A).)[1] Petitioners ground their Section 30(A) claims on the Ninth Circuit Court of Appeals' decision in *Orthopaedic Hosp. v. Belshe* (9th Cir.

---

[1] Medicaid provisions are commonly referred to by the sections of the Act (e.g., Section 1902(a)(30)(A)). We follow that practice, but also provide citations to the United States Code (e.g., 42 U.S.C. § 1396a, subd. (a)(30)(A)) as appropriate for clarity.

1

1997) 103 F.3d 1491 (*Orthopaedic Hosp.*), in which the circuit court held Section 30(A) requires that Medicaid rates be reasonably related to provider costs and that states must base rates on cost studies.

Partnership demurred to the writ petition on several grounds, including that Section 30(A) applies only to fee-for-service programs, and not to managed care. The trial court agreed, sustained the demurrer and ultimately dismissed the writ petition. We affirm, but for a different reason. Regardless of whether Section 30(A) is applicable in the context of managed care, we conclude petitioners' Section 30(A) claims are no longer viable in the wake of the Ninth Circuit's decision in *Managed Pharmacy Care v. Sebelius* (9th Cir. 2013) 716 F.3d 1235 (*Managed Pharmacy Care*), in which the circuit court repudiated its holding in *Orthopaedic Hosp.*

## II. BACKGROUND

### A. Statutory Framework

A rudimentary understanding of the Medicaid program is necessary to understand the allegations of the writ petition. We therefore start with a general overview of the applicable statutes and regulations.

#### 1. Evolution of Federal Law

" 'Medicaid is a cooperative federal-state program through which the federal government reimburses states for certain medical expenses incurred on behalf of needy persons.' " (*Managed Pharmacy Care, supra,* 716 F.3d at p. 1241, quoting *Alaska Dept. of Health and Soc. Services v. Ctrs. for Medicare & Medicaid Services* (9th Cir. 2005) 424 F.3d 931, 934 (*Alaska DHSS*).) "States do not have to participate in Medicaid, but those that choose to do so 'must comply both with statutory requirements imposed by the Medicaid Act and with regulations promulgated by the Secretary' " of the U.S. Department of Health and Human Services (Secretary). (*Managed Pharmacy Care, supra,* 716 F.3d at p. 1241, quoting *Alaska DHSS, supra,* 424 F.3d at p. 935.)

2

Congress established the Medicaid program in 1965. (67 Fed. Reg. 40989 (June 14, 2002)[2]; see *Life Care Centers of America v. CalOptima* (2005) 133 Cal.App.4th 1169, 1174 [35 Cal.Rptr.3d 387] (*Life Care*).) "The program is jointly funded by the federal and state governments and is administered by the states. The states determine eligibility, the types of services covered, payment levels for services, and other aspects of administration, within the confines of federal law." (*Clayworth v. Bonta* (E.D.Cal. 2003) 295 F.Supp.2d 1110, 1113 (*Clayworth*), rev'd on another ground, 140 Fed. Appx. 677 (9th Cir. 2005).

"States must submit to a federal agency (CMS [Centers for Medicare & Medicaid Services], a division of the Department of Health and Human Services) a state Medicaid plan that details the nature and scope of the State's Medicaid program. It must also submit any amendments to the plan it may make from time to time. And it must receive the agency's approval of the plan and any amendments." (*Douglas v. Independent Living Center of Southern California* (2012) __ U.S. __ [132 S.Ct. 1204, 1207].) "Congress expressly delegated to the Secretary the responsibility and the authority to administer the Medicaid program and to review state Medicaid plans and plan amendments for compliance with federal law." (*Managed Pharmacy Care, supra,* 716 F.3d at p. 1241.)

Section 1902(a) of the Social Security Act enumerates the required contents of a state plan. (42 U.S.C. § 1396a, subd. (a)(1)–(83).) Section 30(A), in particular, requires that a state plan must "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . ." (42 U.S.C. § 1396a, subd. (a)(30)(A).)

---

[2] We take judicial notice of two Federal Register publications by the Secretary, 67 Fed. Reg. 40989–41116 (June 14, 2002) and 76 Fed. Reg. 26342–26362 (May 6, 2011). (Evid. Code, §§ 452, subd.(b), 459.)

Exactly what Section 30(A) requires of states in terms of payments to providers has been the subject of considerable litigation. (See 76 Fed. Reg. 26343 (May 6, 2011) [discussing cases and noting at the time there was "no consensus among the circuits"].) In *Orthopaedic Hosp.*, for example, the Ninth Circuit held the section requires that payments "bear a reasonable relationship to an efficient and economical [provider's] costs in providing quality care," and the circuit court remanded with directions to the state to "undertake responsible cost studies that will provide reliable data as to the [provider's] costs" in providing efficient, quality care. (*Orthopaedic Hosp., supra,* 103 F.3d at p. 1500.) *Orthopaedic Hosp.* paved the way for a series of Ninth Circuit cases reiterating and applying its holding in various contexts. (E.g., *California Pharmacists Assn. v. Maxwell-Jolly* (9th Cir. 2010) 596 F.3d 1098, 1105–1107 [state Legislature must engage in analysis required in *Orthopaedic Hosp.* in fixing reimbursement rates]; *Independent Living Center of Southern California v. Maxwell-Jolly* (9th Cir. 2009) 572 F.3d 644, 651–652 [state is required to rely on responsible cost studies in setting reimbursement rates]; see also *California Hospital Assn. v. Maxwell-Jolly* (2010) 188 Cal.App.4th 559, 574–578 [115 Cal.Rptr.3d 572] [agreeing with *Orthopaedic Hosp.* that state must consider provider costs in setting reimbursement rates].)[3]

In its recent decision in *Managed Pharmacy Care,* however, the Ninth Circuit reversed course and held Section 30(A) does not require states to consider provider costs in setting rates. (*Managed Pharmacy Care, supra,* 716 F.3d at p. 1241.) "The statute says nothing about cost studies. It says nothing about any particular methodology." (*Id.* at p. 1249.) The court further observed every other circuit that had considered the issue also had held Section 30(A) does not require "any particular methodology." (*Id.* at pp. 1249–1250; see also *California Assn. for Health Services at Home v. State Dept. of*

---

[3] Both *California Pharmacists Assn. v. Maxwell-Jolly, supra*, 596 F.3d 1098 and *Independent Living Center of Southern California v. Maxwell-Jolly, supra*, 572 F.3d 644 were vacated and remanded by *Douglas v. Independent Living Center of Southern California, Inc.* (2012) __ U.S. __ [182 L.Ed.2d 101, 132, S.Ct. 1204, 1211].

4

*Health Care Services* (2012) 204 Cal.App.4th 676, 684 [138 Cal.Rptr.3d 889] [similarly concluding "section 30(A) does not require states to utilize any particular methodology in setting reimbursement rates," nor does it require the state "to consider provider costs in performing its rate review, much less ensure that its rates [bear] a reasonable relationship to such costs"].)  We discuss the scope and import of Section 30(A) in more detail in the next section of this opinion.

### 2. *Fee-for-Service Model and Shift to Managed Care*

"When the Medicaid program was created, coverage typically was provided through reimbursements by the State agency to health care providers who submitted claims for payment after they provided health care services to Medicaid beneficiaries. This reimbursement arrangement is referred to as 'fee-for-service' (FSS) payment." (67 Fed. Reg. 40989 (June 14, 2002).)  Not surprisingly, then, "[i]nitially, there were no statutory or regulatory provisions specifically addressing the use of managed care by State agencies." (*Id.* at p. 40992.)

During ensuing years, pressure grew to provide Medicaid funded services through managed care programs.  In the Omnibus Budget Reconciliation Act of 1981 (Pub. L. 97-35, enacted on August 13, 1981), Congress amended the Social Security Act to "allow[] State agencies to mandate that Medicaid beneficiaries enroll in [managed care organizations]." (67 Fed. Reg. 40989 (June 14, 2002).)  While states were empowered to mandate enrollment in managed care, to implement such programs they were generally "required to obtain a waiver of [the] Medicaid statutory requirement for beneficiary 'freedom of choice' of providers."[4] (*Ibid.*)

---

[4] The Social Security Act empowers the Secretary to waive certain statutory provisions to promote innovation and efficiency.  Section 1115 of the Act authorizes the Secretary, "[i]n the case of any experimental, pilot, or demonstration project" that is "likely to assist in promoting [statutory] objectives," to waive state plan compliance with a number of statutes, including Section 1902a of the Act [42 U.S.C. § 1396a], which embraces Section 30(A).  (42 U.S.C. § 1315, subd. (a)(1).)  Section 1915 of the Act authorizes the Secretary to grant waivers of numerous provisions of Section 1902a of the Act [42 U.S.C. § 1396a], including Section 30(A), "to promote cost-effectiveness and efficiency." (42 U.S.C. § 1396n, subd. (b).)  We note that while waiver of the freedom-

After the passage of the 1981 Budget Act, states increasingly "provided Medicaid coverage through contracts with managed care organizations . . . , such as health maintenance organizations . . . . Through these contracts [a managed care organization] is paid a fixed, prospective, monthly payment for each beneficiary enrolled with the entity for health coverage. This payment approach is referred to as 'capitation.' Beneficiaries enrolled in capitated [managed care organizations] are required to receive health care services . . . through the [managed care organization] that receives the capitation payment." (67 Fed. Reg. 40989 (June 14, 2002).)

By 1997, 43 percent of all Medicaid beneficiaries "were enrolled in [managed care organizations] for a comprehensive array of Medicaid services." (67 Fed. Reg. 40989 (June 14, 2002).) At this point, the need for statutory and regulatory provisions pertaining specifically to managed care was acute. Accordingly, in the Balanced Budget Act of 1997 (Pub. L. 105-33, enacted on Aug. 5, 1997), Congress once again amended the Social Security Act, this time adding new provisions pertaining to managed care. (67 Fed. Reg. 40990 (June 14, 2002) [1997 Budget Act "represent[ed] the first comprehensive revision to Federal statutes governing Medicaid managed care in over a decade"].) Specifically, the 1997 Budget Act added Section 1932 to the Social Security Act [42 U.S.C. § 1396u-2] and amended Section 1903(m) of the Act [42 U.S. C. § 1396b, subd. (m)].

These two statutory provisions: "(1) Reduce requirements for State agencies to obtain waivers to implement certain managed care programs[5]; (2) eliminate enrollment

of-choice requirement (one of the many plan requirements enumerated in Section 1902(a) of the Act [42 U.S.C. § 1396a(a)(23)(A)]) has frequently been mentioned in the regulatory history (e.g., 67 Fed. Reg. 40989, 40990, 40993 (June 14, 2002)), no similar mention has been made of the need for a waiver of the requirements of Section 30(A) (also one of the plan requirements set forth in Section 1902(a) [42 U.S.C. § 1396a(a)(30)(A)]).

[5] Section 1932 of the Act exempts managed care organizations from three of the plan requirements set forth in Section 1902(a) of the Act—that a plan must be in effect throughout the state (42 U.S.C. § 1396a, subd. (a)(1)), must provide comparable services to all beneficiaries (*id.*, subd. (a)(10)(B)), and must allow beneficiaries freedom of choice

6

composition requirements for managed care contracts; (3) increase beneficiary protections for enrollees in Medicaid managed care entities; (4) improve quality assurance; (5) establish solvency standards; (6) protect against fraud and abuse; (7) permit a period of guaranteed eligibility for Medicaid beneficiaries; and (8) improve certain administrative features of State managed care programs."[6] (67 Fed. Reg. 40990 (June 14, 2002).)

The Secretary, in turn, promulgated an extensive regulatory scheme implementing the new legislation, set forth in 42 Code of Federal Regulations part 438. (42 C.F.R. § 438 et seq. (2012).) The Secretary drew on two decades of studies and oversight of managed care programs to identify "the approaches, tools, and techniques that we believed would most effectively measure and improve health care quality in managed care."[7] (67 Fed. Reg. 40993 (June 14, 2002).)

---

in selecting a Medicaid provider (*id.*, subd. (a)(23)(A)). (42 U.S.C. § 1396u-2, subd. (a)(1)(A)(i).) Notably, this list of exemptions from Section 1902(a) plan requirements does not include Section 30(A). Moreover, in 2009, Congress added a new paragraph (h) to Section 1932, specifically addressing "Indian managed care entities" and expressly providing, among other things, that the paragraph is not to be construed "as waiving the application of . . . [Section 30(A)] . . . (relating to application of standards to assure that payments are consistent with efficiency, economy, and quality of care)." (42 U.S.C. § 1396u-2, subd. (h)(2)(D).) This language in the managed care statute, itself, suggests Congress does not view the fundamental objectives of Section 30(A)—efficiency, economy, quality of care and access—as inherently inconsistent with managed care.

[6] These comprehensive statutory provisions, thus, address efficiency, economy, quality of care and access to care—i.e., the fundamental objectives of Section 30(A)—in the context of managed care. (E.g., § 1396u-2, subd. (b) [extensive "beneficiary protections"], subd. (c) [extensive "quality assurance standards"]; § 1396b(m) [strict "solvency" requirements].)

[7] Like the managed care statutes, the regulations comprehensively address efficiency, economy, quality of care and access in the context of managed care. (E.g., 42 C.F.R. §§ 438.100 et seq. [beneficiary protections], 438.200 et seq. [quality assurance] 438.6 [contract requirements] (2012).)

### 3. *California's Medicaid Program (Medi-Cal)*

"California's Medicaid program is known as Medi-Cal." (C*layworth, supra,* 295 F.Supp.2d at p. 1114.) "It is administered by the California Department of Health Services" and "operates on both a fee-for-service and managed care basis." (*Ibid.*)

In connection with the " 'fee for service' process . . . [the Department] determines whether the healthcare services were 'medically necessary' and, if so, pays the service providers directly. [Citation.] When [the Department] pays service providers directly, it follows a schedule of benefits ([Welf. & Inst. Code,] § 14132), many of which are subject to 'utilization controls,' such as prior authorization by a [Department] consultant, a postservice prepayment audit, a limitation on the number of services, and a separate review of the services provided. ([I*d.*,] § 14133.)" (*Life Care, supra,* 133 Cal.App.4th at p. 1174.)

"Alternatively, [the Department] administers Medi-Cal through various managed care models operated by public and private entities under contract. ([Welf. & Inst. Code,] §§ 14087.5–14087.95.) The purpose of these managed care programs is to ' " reduce costs, prevent unnecessary utilization, reduce inappropriate utilization, and assure adequate access to quality care for Medicaid recipients." ' [Citation.]" (*Life Care, supra,* 133 Cal.App.4th at pp. 1174–1175.)

"One legislatively authorized managed care model" is a county organized health system, such as Partnership Health Plan. (*Life Care, supra,* 133 Cal.App.4th at p. 1175.) In the Omnibus Budget Act of 1990, Congress both acknowledged this particular species of managed care entity (which, in federal parlance, is called a "health insuring organization") and exempted it from the statutory requirements otherwise applicable to a "managed care organization" as defined under federal law.[8] (67 Fed. Reg. 40994 (June 14, 2002).)

---

[8] The Secretary has thus explained that county organized health systems "are managed care delivery systems unique to California . . . . [They] are exempt from the managed care requirements of section 1932 of the [Social Security] Act (implemented through 42 CFR Part 438) because they are not subject to the managed care contract

County organized health systems operate under a legislative scheme set forth in Welfare and Institutions Code sections 14087.5 to 14087.93. (*Life Care, supra,* 133 Cal.App.4th at p. 1178.) Such a system "operates under a contract negotiated by the California Medical Assistance Commission [now, by the Department] on behalf of the state. ([Welf. & Inst. Code,] § 14087.5, subd[s. (a), (c)(1)].) Rather than operating under specific statutory mandates, the county is bound by the rules, terms, and conditions negotiated under the contract. ([*Id.*,] § 14087.55.) In addition, standard contracts require the [county organized health system] to develop, implement and maintain utilization management controls." (*Life Care, supra,* 133 Cal.App.4th at p. 1179.) Thus, unless the contract expressly incorporates statutory provisions otherwise applicable to the state Department of Health Services in providing Medi-Cal services directly through fee-for-service programs, a county organized health system is not subject to such provisions. (*Id.* at pp. 1179–1180.)

A county organized health system "is paid on a fixed, or 'capitated' basis for each Medi–Cal recipient, regardless of the level of services used by each recipient. In turn, the [health system] assumes the financial risk of its members' care and pays health service providers directly. ([Welf. & Inst. Code,] § 14087.6.)" (*Life Care, supra,* 133 Cal.App.4th at p. 1175.) Section 14087.6 also "confers upon counties operating a [county organized health system] broad authority to determine the manner in which it reimburses care providers." (*Id.* at p. 1181.) In short, "the Legislature granted [county organized health systems] the authority to negotiate a broad range of payment terms with

requirements of 1903(m)(2)(A)" that apply to managed care organizations as defined by federal law and contracts with such organizations. (AA 104) While county organized health systems are not managed care organizations as statutorily defined, they are nevertheless subject to regulatory control by the Secretary as managed care entities. (See 67 Fed. Reg. 40992 (June 14, 2002) [discussing Secretary's exercise of her broad authority under the Act to "impose regulatory requirements" on managed entities exempt from statutory requirements].) Indeed, the term "health insuring organization" (which includes county organized health systems) is expressly defined in the managed care regulations [42 C.F.R. § 438.2 (2012); see 67 Fed. Reg. 40996 (June 14, 2002)], and a number of the regulations expressly apply to these entities. (E.g., 42 C.F.R. §§ 436.6(b) & (c), 483.310(c) (2012).)

9

health care providers, subject only to the restriction that the amount payable not exceed the estimate under the Medi-Cal fee-for-service program." (*Ibid.*) The state may, of course, contractually restrict a county's payment rates and practices. (*Ibid.*) The state also "is required to monitor each [county organized health system] as to the level and quality of services rendered, the costs incurred, and compliance with federal law. ([Welf. & Inst. Code,] § 14087.8.)" (*Ibid.*)

Prior to the 1997 enactment of the Medicaid statutes pertaining specifically to managed care, California operated Medi-Cal managed care programs through various waivers issued by the Secretary under Section 1915(b) of the Social Security Act. One of these waivers allowed for the use of "health insuring organizations" (called, as we have discussed, county organized health systems under state law), pursuant to which Partnership Health Plan has operated a managed care system.

With this general background, we now turn to petitioners' allegations.

## B. The Allegations of the Petition

We recite only the allegations pertinent to the issue on appeal, namely whether petitioners have stated a claim against Partnership Health Plan under Section 30(A). In this regard, petitioners allege the following:

In October 2010, the state enacted legislation requiring Medicaid eligible seniors and persons with disabilities to be enrolled in Medi-Cal managed care plans, so long as the state obtained the necessary waiver under Section 1115 of the Social Security Act. The following month, the Secretary (through the Centers for Medicare & Medicaid Services) granted such waiver for a Medicaid "Demonstration" entitled "California Bridge to Reform" (California Demonstration). The waiver covers the period from November 1, 2010 through October 31, 2015.

The waiver and its Special Terms and Conditions[9] allowed the state Department of Health Care Services to contract with Partnership Health Plan to arrange for the provision

---

[9] The Special Terms and Conditions were issued in conjunction with, and as a part of, the waiver. They are 116 pages in length and address all aspects of the Demonstration, including as it pertains to Medicaid eligible seniors and persons with disabilities.

of pharmacy services to Medicaid eligible seniors and persons with disabilities through contracting pharmacies.

As a result, on July 1, 2011, "thousands" of seniors and persons with disabilities in Marin and Mendocino counties "who formerly received their Medi-Cal pharmacy services under a statewide Medi-Cal fee-for-service program" were mandatorily enrolled "en masse" into Partnership Health Plan, "a Medi-Cal managed care entity." Petitioners' pharmacies, likewise, became part of "the network of pharmacies" in Partnership's Medi-Cal pharmacy program.

The pharmacies contract directly with MedImpact, a pharmacy benefit manager which performs data processing for Partnership. However, it is Partnership Health Plan, itself, that (1) authorizes and approves payment rates or amounts paid to pharmacies in the network, (2) adopts the drug formulary and the policies for approving treatment authorization requests for the network, (3) ultimately approves or disapproves every treatment authorization request submitted by a pharmacy on behalf of the Medi-Cal beneficiary, (4) determines which generic drugs are subject to a maximum allowable cost limit on reimbursement for the pharmacy's acquisition cost, and (5) sets the amount of the maximum allowable cost limit for each generic drug.

There is a significant disparity between the reimbursement provided by private third party payors and by Partnership for pharmacy services and prescription drugs, and the pharmacies are sustaining net losses on "virtually all or most of their sales" in the Partnership program.

Section 30(A) allegedly "manifestly applies" to setting rates for Partnership Health Plan's pharmacy program. "[P]rocedurally," Section 30(A) allegedly requires Partnership to "consider the statutory factors of efficiency, economy, and quality of care in setting a  pharmacy provider rate." "[S]ubstantively," the statute allegedly requires that payments "be set or paid that bear a reasonable relationship to efficient and economic pharmacies costs of providing quality services." "To do this," Partnership "must rely on responsible cost studies." Additionally, Partnership cannot set rates "in which budgetary considerations are the sole or conclusive consideration."

11

Thus, Partnership allegedly "procedurally" violates Section 30(A) "systematically" by having "systems, policies, practices, and payments which are based on purely budgetary, i.e., financial, considerations, made without regard to the factor of quality of care." Or, stated another way, there is a "procedural violation" of Section 30(A) "in that the rates are set so substantially below the costs of pharmacies to acquire-and-dispense the medicines, that they could not have been set with any consideration of quality of care or of costs of pharmacies to furnish quality care to their patients." (Italics omitted.) Partnership similarly "substantively" violates Section 30(A) "systematically" by having "systems, policies, and practices and payments which pay pharmacies payments that bear no relationship to pharmacies' costs to acquire-and-dispense medications." Or, stated another way, there is a "substantive violation" of Section 30(A) because rates "bear no rational relationship to pharmacies' costs to acquire-and-dispense the vast majority of the prescriptions."

As relief, petitioners seek a writ requiring Partnership Health Plan, among other things, to adopt new pharmacy rates "(i) for their cost to acquire both brand drug products and multi-source drug products, and (ii) for their overhead cost, per prescription,—which rate or rates of payment,— including payments to reimburse for acquisition costs, and dispensing fee payments to reimburse for overhead costs to dispense a prescription, [which] shall be reasonably related to costs of pharmacies to furnish quality pharmacy and prescription services and shall comply with the procedural and substantive requirements of Section 30A." Petitioners similarly seek a writ requiring Partnership to cease utilizing its "maximum allowable cost" policy for generic drugs and to adopt a new policy "which complies with Section 30(A)." In the interim, petitioners ask that Partnership be required to pay the rates "currently being paid in the statewide Medi-Cal fee-for-service program." They also ask that the court review new rates and policies to insure "conformance" with "the requirements of Section 30(A)."

## C. The Demurrer and Dismissal

Partnership demurred to the petition on several grounds, including that Section 30(A) does not apply to managed care. The trial court agreed. It concluded

12

Partnership is a managed care organization, and "as a matter of statutory construction, [Partnership's] obligation to insure quality care is governed" by Section 1932 of the Social Security Act [42 U.S.C. § 1396u-2], not Section 30(A) [42U.S.C. § 1396a, subd. (a)(30)(A)]. Although granted leave to amend, petitioners chose not to do so, and the court dismissed the writ petition with prejudice.

### III. DISCUSSION[10]

As we have discussed, in *Managed Pharmacy Care*, the Ninth Circuit repudiated its decision in *Orthopaedic Hosp. Orthopaedic Hosp.* involved a traditional fee-for-service Medi-Cal program. The circuit court held Section 30(A) requires state payments to providers to "bear a reasonable relationship to an efficient and economical [provider's] costs in providing quality care" and to accomplish that mandate, states must "undertake responsible cost studies that will provide reliable data as to the [provider's] costs" in providing efficient, quality care. (*Orthopaedic Hosp., supra,* 103 F.3d at p. 1500.)

This view was not shared by other circuits, or by the Secretary, and in *Managed Pharmacy Care*, which also involved a fee-for-service program, the Ninth Circuit reversed course. Observing the language of Section 30(A) "is 'broad and diffuse,' " the court concluded the Secretary's interpretation of the "amorphous language" is entitled in great deference.[11] (*Managed Pharmacy Care, supra*, 716 F.3d at pp. 1247–1248.)

---

**10** The standard of review on appeal from a judgment of dismissal following the sustaining of a demurrer to a petition for writ of mandate without leave to amend is well established. We examine the pleading de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory. (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655 [117 Cal.Rptr.3d 207].) We give the pleading "a reasonable interpretation and treat the demurrer as admitting all material facts properly pleaded, but we do not assume the truth of contentions, deductions, or conclusions of law." (*Ibid.*) If the trial court's judgment denying the petition "is correct in result, it must be affirmed, irrespective of the considerations which may have moved the trial court to its conclusions." (*Little v. Los Angeles County Assessment Appeals Bds.* (2007) 155 Cal.App.4th 915, 925, fn. 6 [66 Cal.Rptr.3d 401].)

**11** Pointing out the Secretary was not party in *Orthopaedic Hosp.*, the circuit court observed it did not have the benefit of her input and therefore had to interpret the statute "in the absence of an authoritative agency construction." (*Managed Pharmacy Care, supra*, 716 F.3d at pp. 1245–1246.) We are laboring under a similar absence of input

13

Accordingly, in *Managed Pharmacy Care,* the Ninth Circuit held, as had other circuits, that Section 30(A) does not require states to consider provider costs in setting rates. (*Managed Pharmacy Care, supra*, 716 F.3d at p. 1241.) "Rather, by its terms [section] 30(A) requires a substantive result—reimbursement rates must be consistent with efficiency, and quality care, and sufficient to enlist enough providers to ensure adequate beneficiary access. Congress did not purport to instruct the Secretary *how* to accomplish these substantive goals. That decision is left to the agency." (*Id.* at p. 1249.) While provider costs might be pertinent, the court observed that also might not be the case, "depending on the circumstances of each State's plan. Each state participating in Medicaid has unique, local interests that come to bear. The Secretary must be free to consider, for each State, the most appropriate way for that State to demonstrate compliance with [Section] 30(A)." (*Ibid*.)

Fairly read, petitioners' claims are all predicated on *Orthopaedic Hosp.*'s now repudiated holding that Section 30(A) requires that provider costs be taken into account in determining payment rates and that states must conduct cost studies before setting rates. In supplemental briefing, petitioners asserted they have also alleged a more generic claim, that Partnership's payment rates are not consistent with "quality care." This excised reading of their allegations, however, requires the reader to turn a blind eye to the vast majority of their allegations, which include *express* citations to *Orthopaedic Hosp.* It also ignores the relief they seek—a writ requiring Partnership to set new reimbursement rates based on petitioners' costs to acquire pharmaceutical products,

from the Secretary despite the complexity of Medicaid administration, the recognition "the agency is the expert in all things Medicaid" (*id.* at p. 1248), and the Secretary's involvement with the use of managed care delivery systems since the inception of the Medicaid program. Nor has this case had the benefit of the Department of Health Services' participation, despite the fact it is the body that deals with the Secretary in connection with the California Demonstration and is charged by statute with monitoring county organized health systems, including as to the level and quality of services rendered, the costs incurred, and compliance with federal law. (Welf. & Inst. Code, § 14087.8.)

overhead costs, and service costs, so that rates are "reasonably related to costs of pharmacies to furnish quality pharmacy and prescription services."

In further supplemental briefing, petitioners contended they have stated a claim under the Third Circuit's recent decision in *Christ the King Manor, Inc. v. Secretary United States Department of Health and Human Services* (3d Cir. 2013) 730 F.3d 291 (*Christ the King Manor*). *Christ the King Manor* also involved a traditional fee-for-service program, for nursing home care. This case arose as a challenge under the federal Administrative Procedure Act to the Secretary's approval of a supplemental state plan amendment. While the Third Circuit partially reversed summary judgment for the Secretary, it did not back away from its view that Section 30(A) "does not impose any particular method or process" on a state as to how it achieves the statute's substantive mandate to " 'assure that payments to providers produce four outcomes: (1) "efficiency," (2) "economy," (3) "quality of care," and (4) adequate access to providers.' " (*Id.* at p. 308, quoting *Pa. Pharmacists Assn. v. Houstoun* (3d Cir. 2002) 283 F.3d 531, 537 (*Pa. Pharmacists Assn*); *Rite Aid, Inc. v. Houstoun* (3d Cir. 1999) 171 F.3d 842, 851 (*Rite Aid*).)

Rather, the circuit court held the "sparse" administrative record before it, which contained "no studies or analyses of any kind," was insufficient to show that the proposed plan amendment, applying a purported temporary adjustment factor that reduced nursing home reimbursement rates below what would otherwise be paid under the state's formula, complied with Section 30(A). (*Christ the King Manor, supra*, 730 F.3d at p. 309.) The court explained that while the reduction might "not affect quality of care," the contrary might also be true, particularly after years of utilizing what was supposed to have been a temporary adjustment factor. (*Id.* at p. 311.) What the Secretary could not do was simply conclude, without any data, that "because prior cuts did not seem too painful, a deeper cut would not hurt." (*Ibid.*) Similarly, the Secretary could not rely *solely* on the fact other statutes pertaining to nursing homes imposed quality care standards or on the state's "unsupported assertion" its plan would continue to meet Section 30(A)'s requirements. (*Id.* at pp. 311–313.)

15

Unlike *Christ the King Manor*, we are not dealing with traditional fee-for-service rate setting, or with a state plan or supplemental plan amendment subject to approval by the Secretary, or with an administrative record like that before the Third Circuit being challenged under the federal Administrative Procedures Act. Moreover, the Third Circuit reaffirmed its view that even in the traditional fee-for-service context, Section 30(A) does not require any specific rate methodology and the Secretary has great discretion in determining how the "four outcomes" required by Section 30(A)—"efficiency," "economy," "quality of care," and "adequate access to providers"—are achieved. (730 F.3d at pp. 307–308.) " 'Section 30(A), unlike the Boren Amendment, does *not* demand that payments be set at levels that are sufficient to cover provider costs,' but instead requires that they be 'sufficient *to meet recipients' needs*.' " (*Id.* at p. 308, quoting *Pa. Pharmacists Assn., supra,* 283 F.3d at p. 538, italics added.) Thus, "Section 30(A) allows states to set a rate methodology using any process that is reasonable, considers more than simply budgetary factors, and results in payments that are sufficient *to meet recipients' needs*." (*Christ the King, supra,* at p. 308, italics added.)

Notably, the managed care statutes and regulations similarly speak in terms of providing adequate beneficiary access to health care. For example, the extensive "Beneficiary protections" set forth in the statutes include requirements that managed care organizations demonstrate that they have the "capacity to serve the expected enrollment" in each service area [42 U.S.C. § 1396u-2, subd. (b)(5)], offer "an appropriate range of services and access to preventative and primary care services" [*id.*, subd. (b)(5)(A)], and maintain "a sufficient number, mix, and geographic distribution of providers of services" [*id.*, subd. (b)(5)(B)]. Thus, the Secretary, during the regulatory promulgation process, declined to extend the statutory requirement imposed on managed care organizations— that such entities be "actuarially sound"—to payment rates between managed care organizations and subcontracting providers. (67 Fed. Reg. 40998 (June 14, 2002).) The Secretary explained she does "not regulate the payment rates between [managed care organizations] and subcontracting providers" (save for one exception not pertinent here).

16

(*Ibid.*) "Congress has not established any standards for payments to subcontractors" because "one of the efficiencies of managed care is premised on [a managed care organization's] ability to negotiate favorable payment rates with network providers. [Managed Core Organizations] must pay sufficient rates to guarantee that their networks meet the access requirements in subpart C of this final rule." (*Ibid.*) Thus, "payment rates are adequate to the extent the [managed care organization] has documented the *adequacy of its network*." (*Ibid.*, italics added; see also *id.* at p. 41019 [Secretary does "not believe that it is necessary to impose [provider compensation requirements on managed care organizations] beyond requiring that payments to providers be sufficient to encourage sufficient provider participation."])

Petitioners' allegations do not focus on the Medicaid recipients, but on the sub-contracting providers. Their allegations also do not contend Partnership's network is inadequate to serve recipients, but instead insist provider payment rates must, under Section 30(A), take into account provider costs. In sum, petitioners' Section 30(A) claims are based squarely on the Ninth Circuit's interpretation of that statute in *Orthopaedic Hosp.* With the demise of that case, so, too, go petitioners' claims, as we agree with the Ninth Circuit's analysis and holding in *Managed Pharmacy Care.* (See also *California Assn. for Health Services at Home v. State Dept. of Health Care Services, supra,* 204 Cal.App.4th at pp. 684–685 [reaching same conclusions Ninth Circuit reached in *Managed Pharmacy* Care].) Petitioners state no claim under Section 30(A) as interpreted in *Managed Pharmacy Care*, and we need not go further to affirm the judgment of dismissal.[12]

---

[12] We therefore do not resolve the questions of whether Section 30(A) applies in the context of managed care, and if it does, what its scope and import is in that context. Nor do we need to reach petitioner's claim that Partnership is, in fact, operating a fee-for-service pharmacy program and is therefore subject to Section 30(A) as it applies to such traditional programs. However, as to that point, we discern no legal basis on which petitioners can pluck the "pharmacy category of services" out of the many services provided through Partnership's managed care system, and as to that one service invoke statutory and regulatory provisions applicable to traditional fee-for-service state plans subject to approval by the Secretary. Both the Secretary and the state view and treat

17

## IV. DISPOSITION

The judgment dismissing the petition for writ of mandate is affirmed.

Respondents to recover costs on appeal.

_____
Banke, J.

We concur:

_____
Margulies, Acting P. J.

_____
Dondero, J.

---

Partnership as a managed care entity, and we would decline to do otherwise by parsing the benefits provided under its auspices.

Trial Judge:                          Honorable Evelio M. Grillo
Trial Court:                          Alameda County Superior Court


Medicaid Defense Fund and Lynn S. Carman; and Natallia Mazina for Plaintiffs and Appellants.

Burke, Williams & Sorensen and J. Leah Castella; and Douglas S. Cumming for Defendant and Respondent.