Filed 5/29/24  Perea v. Ghaly CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ANALILIA JIMENEZ PEREA et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>MARK GHALY, as Secretary, etc., et al.,<br><br>        Defendants and Respondents. | A165963<br><br>(Alameda County<br>Super. Ct. No. RG17867262) |

Plaintiffs assert the state's funding, and the defendants' management, of the California Medical Assistance Program (Medi-Cal) has been woefully inadequate and as a consequence Latinos, who comprise a disproportionate percentage of Medi-Cal beneficiaries, are being discriminated against on the basis of their ethnicity.  Plaintiffs ground their discrimination claims on Government Code section 11135, which broadly prohibits discrimination in state-funded programs and activities.  In this appeal, plaintiffs challenge rulings rejecting their disparate impact claims on the ground they have been unable to identify proper "comparator" groups impacted by the legislative and administrative actions they challenge.  Plaintiffs' concern that, over the years, chronic budgetary problems and allegedly inadequate administrative oversight have negatively impacted the state's ability to fund Medi-Cal, is understandable.  Nevertheless, the trial court judges who ruled on plaintiffs'

1

discrimination claims properly concluded they cannot attack those problems through the disparate impact discrimination claims they have attempted to advance here.

## BACKGROUND

### *Medicaid and Administration of the Medi-Cal Program*

Medicaid is "a federal-state cooperative program for the provision of medical care to certain low-income populations." (*Family Health Centers of San Diego v. State Dept. of Health Care Services* (2023) 15 Cal.5th 1, 5 (*Family Health Centers*); *Santa Rosa Memorial Hospital, Inc. v. Kent* (2018) 25 Cal.App.5th 811, 815 (*Santa Rosa*).) " 'The program is jointly funded by the federal and state governments and is administered by the states. The states determine eligibility, the types of services covered, payment levels for services, and other aspects of administration, within the confines of federal law.' " (*Keffeler v. Partnership Healthplan of California* (2014) 224 Cal.App.4th 322, 327 (*Keffeler*).) To qualify for federal funds, each state must submit a detailed Medicaid plan describing the nature and scope of its program to the Centers for Medicare and Medicaid Services (a division of the Department of Health and Human Services) for review and approval. (*Santa Rosa,* at p. 815; *Keffeler,* at p. 327.)

"California participates in Medicaid through the California Medical Assistance Program, known as 'Medi-Cal,' which is administered by the Department of Health Care Services . . . [(DHCS)]." (*Family Health Centers, supra,* 15 Cal.5th at p. 7.) As part of its coverage, Medi-Cal pays for health

care services in various service categories, including, physician and clinician services (collectively, "physician services")[1] and long-term care.[2]

The Medi-Cal program delivers and pays for health care services through two methods or systems: fee-for-service and managed care. (*Keffeler, supra,* 224 Cal.App.4th at pp. 330–331.)

Under the fee-for-service system, the DHCS reimburses healthcare providers directly for covered services provided to Medi-Cal beneficiaries. It pays the provider according to a fixed fee schedule. Medi-Cal is required to periodically review and revise these rates as necessary to comply with applicable federal requirements. (Welf. & Inst. Code, § 14079.) Plaintiffs allege the DHCS has not enacted a "systemwide increase in rates" in over 20 years.

Under managed care, beneficiaries enroll with local managed care organizations (MCOs) and the state pays the MCOs a fixed, per-beneficiary "capitation" payment. Medi-Cal uses the fee-for-service schedule as a benchmark for setting the managed care capitation rate. The vast majority of Medi-Cal beneficiaries using physician services are currently enrolled in managed care. Plaintiffs allege the DHCS's process for setting capitation rates results in arbitrarily low rates for a variety of reasons, including because it relies on the low fee-for-service reimbursement rates as a component of the process. Plaintiffs further allege that while the DHCS

---

[1] In their third amended complaint, plaintiffs "refer to physician and clinician services in shorthand as 'physician services.'" We do so, as well.

[2] Medicaid provides funding for 31 categories of services. (42 U.S.C. § 1396d(a)(1)–(31).) Participating states are not required to provide all such services. (*Id.,* § 1396a(a)(10)(A) [specifying required services].) California, through Medi-Cal, provides funding for many of them, including physician services and long-term care services. (Cal. Code Regs., tit. 22, § 51301 et seq. [schedule of benefits covered by Medi-Cal].)

annually updates capitation rates using the prior years' experience as a baseline, it fails to adequately monitor or enforce access to care for MCO participants.

***Plaintiffs' Claims***

Plaintiffs are Medi-Cal beneficiaries who utilize the physician services category of benefits. Although they allege defendants, and the DHCS in particular, have failed to comply with a number of specific statutory and regulatory duties and obligations,[3] they have not sued for mandamus relief compelling defendants to comply with these asserted duties and obligations. Rather, plaintiffs maintain defendants' alleged failure to comply with statutory and regulatory mandates constitutes actionable discrimination against Latino Medi-Cal beneficiaries under both intentional and disparate impact theories and they seek mandamus and injunctive relief prohibiting such discrimination. The instant appeal concerns only plaintiffs' disparate impact claims.[4]

---

[3] For example, plaintiffs allege defendants have violated statutory and regulatory duties to review and revise reimbursement rates to ensure reasonable access to physician and dental services, include a minimum number of primary care providers per participant in their networks, ensure appointment availability within a maximum number of days, and provide for physicians within a maximum distance or travel time from where participants live (citing Welf. & Inst. Code, §§ 14079, 14197; Health & Saf. Code, §§ 1340–1399.864; Cal. Code Regs., tit. 28, §§ 1000–1300.826). Whether defendants have violated any of these asserted duties is not an issue that is before us in this appeal.

[4] Following the trial court's ruling sustaining defendants' demurrer to their third amended complaint, plaintiffs voluntarily dismissed their intentional discrimination claims without prejudice. Accordingly, we neither review nor take any position on the potential merit of those claims. We note, however, that plaintiffs have made serious allegations in their complaint and observe that an intentional discrimination claim entails an analysis different than that applicable to a disparate impact claim. (Compare *Village of*

4

Plaintiffs predicate their discrimination claims on statistics showing the proportion of Medi-Cal beneficiaries who identify as Latino has increased significantly, and disproportionately, since the late 1970s. As of 1980, approximately 25 percent of Medi-Cal beneficiaries were Latino (whereas 19 percent of the state population was Latino). By 2018, 58 percent of Medi-Cal beneficiaries were Latino (whereas 39 percent of the state population was Latino).

Plaintiffs therefore maintain the state's funding and the defendants' administration of the Medi-Cal program has had an increasingly disproportionate, and negative, impact on Latinos. Specifically, plaintiffs allege: (1) defendants' "disinvestment" in the Medi-Cal program through various actions and inactions has resulted in a decline in reimbursement rates in comparison with market rates for physician services since 1979, (2) defendants have failed to monitor and enforce requirements regarding the adequacy of Medi-Cal's provider network which has been negatively impacted by the low reimbursement rates, and (3) defendants have imposed

---

*Arlington Heights v. Metropolitan Housing Development Corp.* (1977) 429 U.S. 252, 266–268 (*Arlington Heights*) [setting forth "sensitive" multi-factor analytical framework for intentional discrimination claim based on direct and circumstantial evidence] with *Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc.* (2015) 576 U.S. 519, 524–525 (*Inclusive Communities*) ["In contrast to a disparate-treatment case, where a 'plaintiff must establish that the defendant had a discriminatory intent or motive,' a plaintiff bringing a disparate-impact claim challenges practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale."]; *id.* at pp. 542–543 [courts must employ "adequate safeguards at the prima facie stage" and "examine with care whether a plaintiff has made out a prima facie case of disparate impact" to avoid serious constitutional questions that would arise from pervasive use of race and racial quotas].)

5

administrative barriers, including inadequate reimbursement rates, that limit access to care.

Plaintiffs contend these alleged funding and administrative shortcomings have disproportionately harmed Latino beneficiaries by limiting their access—or providing them "inferior" access—to physician services when compared to three posited groups with disproportionately White populations. These comparator groups are: (1) California residents who have health insurance through other plans, including Medicare and private insurance, (2) current Medi-Cal beneficiaries receiving long-term care services, and (3) past Medi-Cal beneficiaries who utilized physician services. Plaintiffs maintain the asserted disparity in access constitutes actionable discrimination under Government Code section 11135[5] and its implementing regulations.

## DISCUSSION[6]

### *Threshold Issues*

For the first time on appeal, defendants advance two threshold arguments: (1) only a claim of intentional, rather than disparate impact,

---

[5] All further statutory references are to the Government Code unless otherwise indicated.

[6] Our standard of review of a judgment of dismissal following the sustaining of a demurrer without leave to amend and the granting of a motion for judgment on the pleadings is well established. When reviewing an order sustaining a demurrer, we independently determine whether the facts alleged in the complaint are sufficient to state a cause of action. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415; *Thomas v. Regents of University of California* (2023) 97 Cal.App.5th 587, 605.) " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) " 'A

discrimination can be advanced under section 11135 because the statute is modeled on title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.; hereafter title VI), and (2) a disparate impact claim under section 11135 cannot, in any case, be asserted against a state agency. Generally, we will " ' "ignore arguments, authority, and facts not presented and litigated in the trial court" ' " (*Gonzalez v. County of Los Angeles* (2004) 122 Cal.App.4th 1124, 1131), and we deem defendants to have forfeited both issues here. (See *Cabatit v. Sunnova Energy Corp.* (2020) 60 Cal.App.5th 317, 322.)

We also observe that section 11135 broadly provides that no person shall, on the basis of protected categories, "be unlawfully denied full and equal access to" state-funded programs or "be unlawfully subjected to discrimination under" a state-funded program (§ 11135, subd (a)), and that more than a decade ago in *Darensburg v. Metropolitan Transportation Com.* (9th Cir. 2011) 636 F.3d 511, 519 (*Darensburg*), the Ninth Circuit Court of Appeals considered the merits of the plaintiffs' section 11135 disparate impact claims with no suggestion such theory cannot be employed to establish actionable discrimination under that statute. Nor has any subsequent section 11135 case, state or federal, questioned utilization of such theory. (See, e.g., *Villafana v. County of San Diego* (2020) 57 Cal.App.5th 1012, 1017 (*Villafana*); *C.B. v. Moreno Valley Unified School Dist.* (C.D.Cal. 2021) 544 F.Supp.3d 973, 993.) The Legislature, likewise, has taken no action to amend the statute to preclude such claims. (See Stats. 2005, ch. 706, §§ 20, 40, pp. 5657, 5681 [Legislature amended § 11135 to expressly state it applies to California State University, rejecting interpretation in

---

motion for judgment on the pleadings is equivalent to a demurrer and is governed by the same de novo standard of review.' " (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 777.)

7

*Garcia v. Board of Trustees of California State University* (Aug. 15, 2005,
B178329), review den. and opn. ordered nonpub. Nov. 16, 2005.].)

As for defendants' second assertion, that a section 11135 disparate
impact claim cannot, in any case, be asserted against the state or a state
agency, it is predicated on a claim that a definitional provision in the
implementing regulations (Cal. Code Regs., tit. 2, § 11150 [defining
" 'Recipient' " as "not includ[ing] State agencies"][7]) controls over the plain
language of the statute which states, "No person" shall, on the basis of
enumerated characteristics, "be unlawfully subjected to discrimination
under[] any program or activity that is *conducted, operated, or administered
by the state or by any state agency*, is funded directly by the state, or receives
any financial assistance from the state."  (§ 11135, subd. (a), italics added.)  It
is well established that the language of the enabling legislation controls, not
the other way around.  (See § 11342.2 [regulations adopted by state agency
must be consistent and not in conflict with statute]; *Alameda County Deputy
Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2020)
9 Cal.5th 1032, 1067 [regulations that are inconsistent with a statute or
impair its scope are void].)[8]

---

[7] Except where otherwise indicated, all further references to
"Regulation" or "Regulations" are to title 2 of the California Code of
Regulations.

[8] While this appeal was pending, the California Civil Rights Council
issued a notice of approval of regulatory action, amending and adopting
additional implementing regulations for section 11135, including regulations
recognizing the propriety of disparate impact claims, including against the
state and state agencies.  (Regs., § 14000 et seq., filed Mar. 19, 2024, eff. July
1, 2024.)  These regulations go into effect on July 1, 2024, and will be codified
at subchapter 9 of chapter 5 of division 4.1 of title 2 of the California Code of
Regulations.  Plaintiffs requested that we take judicial notice of several of
these proposed and now final, but not yet effective, regulations, and the
prefatory initial and final statements of reasons for the regulations, urging

### *Disparate Impact Discrimination Fundamentals*

Disparate treatment and disparate impact are two different theories by which a plaintiff can prove a claim of unlawful discrimination. (*Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 817 (*Frank*).) To prevail on a disparate treatment theory, the plaintiff must prove the defendant deliberately intended to discriminate. (*Id.* at p. 822 [under disparate treatment theory the " 'plaintiff must prove the ultimate fact that the defendant engaged in intentional discrimination' "]; *Carter v. CB Richard Ellis, Inc.* (2004) 122 Cal.App.4th 1313, 1321 (*Carter*) [" ' "Disparate treatment" is *intentional* discrimination against one or more persons on prohibited grounds.' "].)

A disparate impact claim, in contrast, seeks to remedy discrimination caused by facially neutral practices that disproportionally and negatively impact a protected class and are otherwise unjustified by a legitimate rationale. (*Inclusive Communities, supra,* 576 U.S. at p. 524.) "[D]isparate impact is not proved merely because all members of a disadvantaged subgroup are also members of a protected group." (*Carter*, *supra,* 122 Cal.App.4th at p. 1326.) Rather, "Proof may be offered, 'usually through statistical disparities, that facially neutral . . . practices adopted without a deliberately discriminatory motive nevertheless have such significant adverse effects on protected groups that they are "in operation . . . functionally equivalent to intentional discrimination." ' " (*Frank, supra,*

---

that because they clarify and do not purport to change established law they may properly be considered in the instant case. They further urge that these new regulations refute defendants' threshold arguments. Given our rejection of defendants' arguments as having been forfeited and contrary to well established case law, these new regulations are largely immaterial to our analysis and we deny the request to take judicial notice of them.

9

149 Cal.App.4th at p. 817, quoting *Harris v. Civil Service Com.* (1998)
65 Cal.App.4th 1356, 1365.)

Our courts have adopted a three-part burden-shifting framework for analyzing disparate impact claims. "Under disparate impact law, '(1) a plaintiff establishes a prima facie case if the defendant's facially neutral practice causes a disproportionate adverse impact on a protected class; (2) to rebut, the defendant must justify the challenged practice; and (3) if the defendant meets its rebuttal burden, the plaintiff may still prevail by establishing a less discriminatory alternative.' " (*Villafana, supra,* 57 Cal.App.5th at p. 1017 [applying framework in § 11135 case], quoting *Darensburg, supra,* 636 F.3d at p. 519 [same].)

Thus, " ' "The basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy." ' [Citation.] '[W]e must analyze the impact of [a challenged policy] on minorities in the population base "affected . . . by the facially neutral policy." ' [Citation.] ' "[T]he appropriate inquiry is into the impact on the total group to which a policy or decision applies." ' " (*County Inmate Telephone Service Cases* (2020) 48 Cal.App.5th 354, 368 (*County Inmate*), criticized on other grounds in *Zolly v. City of Oakland* (2022) 13 Cal.5th 780, 789–790; *Darensburg, supra,* 636 F.3d at pp. 519–520.)

In other words, "To make out a prima facie case of disparate impact, a plaintiff must employ an appropriate comparative measure. [Citation.] 'An appropriate statistical measure must . . . take into account the correct population base and its [protected group] makeup.' [Citation.] There is no prima facie case when the wrong base population is used in the statistical sample. [Citation.] '[T]he appropriate inquiry is into the impact on the total

10

group to which a policy or decision applies.' " (*Villafana, supra,* 57 Cal.App.5th at p. 1018.)

In support of their disparate impact claims, plaintiffs have posited three comparator groups. Defendants maintain none of them is a viable comparator group.

## *Comparator Group 1: Californians Insured Through Medicare and Private Insurance Plans*

Plaintiffs' first posited comparator group consists of Californians with other health insurance—that is, Californians who are not Medi-Cal beneficiaries. Plaintiffs assert Medi-Cal's "poor reimbursement [rates] for physicians participating in Medi-Cal, coupled with [defendants'] failures of oversight and erection of administrative barriers, [has] result[ed] in a segregated, two-tiered system with different levels of access to doctors in California." "The lower tier is predominantly Latino with poor access to care and limited to the relatively small share of doctors willing to accept Medi-Cal," while the "upper tier is predominantly White, with superior access to care and a much broader supply of participating physicians."

Putting aside for the moment the viability of this posited comparator group, we first consider whether plaintiffs' allegations in support of this comparison state a claim under section 11135, the statute on which plaintiffs ground their discrimination claims.

Section 11135 states, in relevant part: "No person in the State of California shall, on the basis of sex, race, color, religion, ancestry, national origin, ethnic group identification, age, mental disability, physical disability, medical condition, genetic information, marital status, or sexual orientation, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted,

11

operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state. Notwithstanding Section 11000, this section applies to the California State University." (§ 11135, subd. (a).)

The implementing regulation on which plaintiffs rely, Regulation 11154, similarly provides, "It is a discriminatory practice for a recipient, in carrying out any program or activity directly, or through contractual, licensing or other arrangements, on the basis of ethnic group identification, religion, age, sex, color, or a physical or mental disability" to, inter alia, "deny a person the opportunity to participate in, or benefit from an aid, benefit or service;" "afford a person the opportunity to participate in or benefit from an aid, benefit or service that is not equal to that afforded others;" "otherwise limit a person in the enjoyment of any right, privilege, advantage or opportunity enjoyed by others receiving any aid, benefit or service resulting from the program or activity;" "utilize criteria or methods of administration that: (1) have the purpose or effect of subjecting a person to discrimination on the basis of ethnic group identification, religion, age, sex, color, or a physical or mental disability; [¶] (2) have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's program with respect to a person of a particular ethnic group identification, religion, age, sex, color, or with a physical or mental disability;" or "make or permit selections of site or locations of facilities: [¶] (1) that have the purpose or effect of excluding persons from, denying them the benefits of, or otherwise subjecting them to discrimination under any program or activity; [¶] (2) that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the program or activity with respect to a person of a particular ethnic group identification,

12

religion, age, sex, color, or with a physical or mental disability." (Regs., § 11154, subds. (a), (b), (g), (i)(1)–(2), (j)(1)–(2).)

Thus, on its face, section 11135, subdivision (a) mandates "full and equal access *to* the benefits *of"* the *Medi-Cal program* and prohibits "discrimination *under*" the *Medi-Cal program.* (Italics added.) The implementing regulation on which plaintiffs rely is likewise focused on ensuring the Medi-Cal program is not operated in a way that discriminates *among* beneficiaries (and those eligible to become and applying to be beneficiaries) on the basis of, inter alia*,* their ethnicity. In sum, this general statutory and regulatory prohibition against discrimination in any state-funded program prohibits discrimination in allowing *access to* and in the receipt of benefits *afforded by the program.* It does not, on its face, purport to require that state-funded programs provide services commensurate to those that may be provided by a private program either philanthropic or for-profit.

If plaintiffs had alleged, for example, that the DHCS operates Medi-Cal so as to exclude Latinos from the program, or to prevent them from receiving benefits provided to other beneficiaries under the program, they would state a claim under section 11135. (See e.g., *Hector F. v. El Centro Elementary School Dist.* (2014) 227 Cal.App.4th 331, 333, 335, 342 [father of student afflicted with numerous emotional disabilities who was bullied at school and thus deprived of all the benefits of a public education, had standing to sue district on behalf of student under antidiscrimination and harassment laws, including § 11135]; *Fry v. Saenz* (2002) 98 Cal.App.4th 256, 260–261 [applying department's "completion rule" unlawfully denied children "the benefits of the CalWORKs program on account of their disabilities"].) However, section 11135 and Regulation 11154 are not, on their face, amenable to a claim that, while the Medi-Cal program is accessible to, and all

13

services provided by the program are available to, any individual who qualifies, including Latinos, the program does not provide Medi-Cal beneficiaries with the extent of coverage or the range of provider choices that may be available to other California residents who participate in other health insurance plans.[9]

As plaintiffs point out, section 11135 is to be interpreted broadly given its salutary purpose—to prohibit discrimination in state-funded programs. One of its companion statutes, for example, section 11139, states, "This article shall not be interpreted in a manner that would frustrate its purpose." However, that a statute is to be broadly construed to effectuate its beneficial purposes does not mean its plain language may be disregarded (see *Lee v. Cardiff* (2023) 94 Cal.App.5th 398, 407) or that the courts may read into the statute a mandate it does not include (see *Vasquez v. State of California* (2008) 45 Cal.4th 243, 253).

Recounting the legislative history of section 11135, plaintiffs' amici curiae, Impact Fund et al., emphasize the statute has been steadily amended since its enactment in 1977 to enlarge the categories of protected persons, so that the statute broadly prohibits discrimination in state-funded programs on the basis of "sex, race, color, religion, ancestry, national origin, ethnic group identification, age, mental disability, physical disability, medical condition, genetic information, marital status, or sexual orientation." (§ 11135, subd. (a).) Amici curiae also highlight amendments clarifying the availability of a

---

[9] Defendants point out, and plaintiffs do not dispute, that all of the funding and administrative difficulties plaintiffs allege negatively impact *all* Medi-Cal beneficiaries utilizing physician services. Indeed, plaintiffs allege as much in their third amended complaint.

private right of action (for equitable relief only)[10] and expressly making the statute applicable to the state, itself, and to the California State University system. (§§ 11135, subd. (a), 11139; Regs., § 11142.) While these amendments have expanded the classes of individuals who are entitled to equal access *to,* and equal participation *in,* state funded programs for which they qualify, they did not inject into section 11135 a mandate that state funded programs must deliver the same services and benefits nonstate-funded programs may deliver.

The legislative history of section 11135 as enacted in 1977 also reflects that the statute is intended to be a tool to root out and prohibit unlawful discrimination in allowing access to, and in sharing in the benefits of, state-funded programs. (See, e.g., Assem. Com. on Governmental Organization, Analysis of Assem. Bill No. 803 (1977–1978 Reg. Sess.) as introduced Mar. 7, 1977, p. 1 [bill would "require that state agencies take action to curtail all state funding to any contractor, grantee, or local agency that (1) denies persons the benefits of; or (2) subjects persons to discrimination under, any program or activity that receives any financial assistance from the state"]; Senate Com. on Governmental Organization, Analysis of Assem. Bill No. 803 (1977–1978 Reg. Sess.) as amended June 21, 1977, p. 1 [bill "would prohibit any state-funded program or activity from unlawfully denying benefits or unlawfully discriminating on the basis of ethnic group identification, religion, age, sex, color, or physical or mental disability," and would "Require[] state agencies to curtail funding to any contractor, grantee, or local agency that has engaged in unlawful denial of benefits or unlawful discrimination"]; *id.* at p. 2 ["The major intent of this measure is to shift the burden of proving

_____

[10] The provisions of the statute are otherwise enforced by appropriate state agencies. (§§ 11136, 11137; Regs., §§ 11157, 11158.)

15

unlawful discrimination in a state-funded program from the person being discriminated against to the state agency administering the program."]; Dept. of Transportation, Enrolled Bill Rep. on Assem. Bill No. 803 (1977–1978 Reg. Sess.) Sept. 14, 1977, p. 1 ["bill adds a new section of law prohibiting discrimination in the participation of the benefits of state funded programs" and further provides "state funds going to a recipient violating these provisions, shall be terminated for those programs or activities in which violations are found"].)

In sum, given the plain language of section 11135, which is reinforced by its legislative history, plaintiffs have not alleged, nor can they allege, a viable discrimination claim based on their first comparator group theory.[11]

In addition to the lack of congruence between plaintiffs' allegations and the statutory and regulatory language, plaintiffs' first posited comparator group does not, and cannot, support a disparate impact claim.

To establish a prima facie case of disparate impact discrimination, a plaintiff must use an appropriate comparative measure. (*Villafana, supra,* 57 Cal.App.5th at p. 1018; *Darensburg, supra,* 636 F.3d at p. 519.) " 'An appropriate statistical measure must . . . take into account the correct population base and its [protected group] makeup.' [Citation.] There is no prima facie case when the wrong base population is used in the statistical sample. [Citation.] '[T]he appropriate inquiry is into the impact *on the total group to which a policy or decision applies.*' " (*Villafana,* at p. 1018, italics added; *Darensburg,* at pp. 519–520.)

_____

[11] In response to the court's notice that it intended to take judicial notice of this legislative history, defendants asked that we take judicial notice of additional history. We conclude the additional history is of no significant relevance and deny defendants' request.

16

In *Villafana,* for example, recipients of benefits under the state-funded CalWORKS program sued under section 11135, alleging that unannounced home visits conducted by peace officers disproportionately impacted minorities and women as compared to the county's general population. (*Villafana, supra*, 57 Cal.App.5th at pp. 1015–1016.) The Court of Appeal rejected the plaintiffs' contention that they could base a disparate impact claim on a comparison of CalWORKS participants to the general population of the county, explaining the relevant comparison group under disparate impact law is the group to which the facially neutral practice applies, in that case, CalWORKS participants. (*Id.* at p. 1018.) Because the plaintiffs did not allege that minorities and women suffered any harsher impact than other CalWORKS participants subject to the visitation practice, they failed to state a viable disparate impact claim. (*Id.* at p. 1020.)

Similarly, in *County Inmate, supra,* 48 Cal.App.5th at page 358, county jail inmates brought civil rights claims challenging allegedly exorbitant commissions charged by telecommunications companies that were passed on to inmates and their families making calls to and from the jail. The court rejected the plaintiffs' assertion that they could base a disparate impact claim on a comparison of inmates and their families, who were disproportionately African-American and Latino, to the overall populations of the respective counties. (*Id.* at pp. 367–368.) "The 'total group' to whom defendants provide[d] telephone service by means of their contracts with providers [was] the inmate population; defendants [did] not provide telephone service to any other group. Consequently, the only appropriate inquiry [was] an analysis of the impact on minorities 'in the population base "affected" ' [citation], and that [was] the inmate population. There [was] no other relevant group. And

17

African-American and Latino inmates [were] treated exactly the same as any other inmates."[12] (*County Inmate,* at p. 368.)

Plaintiffs' first posited comparator group suffers from the same problem as did the comparator groups in *Villafana* and *County Inmate*. It attempts to compare the alleged impact of the state's facially neutral Medi-Cal funding and administrative practices on a predominantly Latino Medi-Cal beneficiary population with the extent of coverage and provider choice that may be available to a predominantly White population that is *not subject to* those facially neutral practices. This is not a comparative theory that can support a claim of disparate impact discrimination in the operation of the Medi-Cal program. (See *Villafana, supra,* 57 Cal.App.5th at p. 1020; cf. *Darensburg,*

---

[12] The analysis in *Villafana* and *County Inmate* is consistent with guidance provided in the federal government's title VI legal manual, on which plaintiffs rely heavily in their briefing. In discussing the identification of an appropriate comparator population, it advises: "If an agency uses statistical evidence, it must determine the particular proportion of protected persons and non-protected persons adversely affected. To do this, the agency must 'take into account the correct population base and its racial makeup.' [Citation.] This step in a statistical analysis of disparate impact, therefore, is to identify the base population from which to draw comparative evidence, because the challenged policy must be shown to have a discriminatory effect *within the population or area it affects.* [Citation.] In other words, the legally relevant 'population base' for a statistical measure of adverse disparate impact is all persons the policy or practice affects or who could possibly be affected by some change in (or the elimination of) the policy or practice. Normally, this means 'persons subject to the challenged . . . practice.' [Citation.] . . . [¶] . . . [B]ecause the ultimate question is whether the policy has a discriminatory effect within the population it affects, statistical evidence ideally should be based on comparison groups that include, but do not extend beyond, 'the total group to which the policy was applied.' " (U.S. Dept. of Justice, Civil Rights Division, Title VI Legal Manual (2017) Relevant Comparator Population, pp. 19–20, § VII.C.1.c.iii. <https://www.justice.gov/crt/fcs/T6manual> [as of May 29, 2024].)]

18

*supra,* 636 F.3d at pp. 519–520 [among other shortcomings in the district court's disparate impact analysis, the court erroneously focused on regional transportation expansion plan's impact on minority bus riders, rather than on the "entire integrated transit system's users," including those using other transportation modalities, since all users were impacted by the plan].)

Plaintiffs maintain *Villafana* and *County Inmate* are inapposite because unlike in those cases, Medi-Cal has what plaintiffs call "express equal and integrated access provisions" that "explicitly compare the access [to healthcare] available to Medi-Cal participants to the access [to healthcare] available to the insured public generally."

In support of this argument, plaintiffs point first to Regulation 11154 and specifically to subdivision (i)(2) which, as we have recited, prohibits a recipient of state funds[13] from engaging in discriminatory acts, including "utiliz[ing] criteria or methods of administration that: [¶] . . . [¶] (2) *have the purpose or effect of* defeating or substantially *impairing the accomplishment of the objectives of the recipient's program* with respect to a person of a particular ethnic group identification, religion, age, sex, color, or a physical or mental disability." (Regs., § 11154, subd. (i)(2), italics added.) Plaintiffs maintain this general regulatory language pertaining to all state-funded programs provides an analytical bridge to Medicaid/Medi-Cal's specific statutory and regulatory scheme. And pursuant to this specific statutory and regulatory scheme, say plaintiffs, we can determine whether the state's

---

[13] " 'Recipient' " refers to the party operating the state-funded program, not to the recipient of the benefits afforded by such a program. (Regs., § 11150.) Rather, a person receiving the benefits of such a program is an " 'Ultimate beneficiary,' " defined as "a person identified in Government Code Section 11135 who receives, applies for, or is unlawfully deterred from receiving or applying for, the benefits of, or employment under a program of activity which receives State support." (*Ibid.*)

funding and administration of the Medi-Cal program substantially "impairs [the] accomplishment of the 'objectives' " of that program. Plaintiffs then point to "objectives" of the Medicaid Act and, in turn, the Medi-Cal program, as assertedly expressed in section 1902(a)(30)(A) of the Social Security Act (42 U.S.C. § 1396a(a)(30)(A) (hereinafter "Section 30(A)"), and Welfare and Institutions Code section 14000, subdivision (a).

Section 30(A) requires Medicaid participating states to "provide such methods and procedures relating to . . . the payment for[] care and services available under the plan . . . as may be necessary . . . to assure that payments . . . are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general [insured] population."[14]

In *Armstrong v. Exceptional Child Center, Inc.* (2015) 575 U.S. 320, 328 (*Armstrong*), the United States Supreme Court held "the Medicaid Act

---

[14] The genesis of the current version of Section 30(A) was summarized in *Santa Rosa* as follows: " 'When originally enacted in 1965, the Medicaid Act required states to reimburse health care providers for the "reasonable cost" of hospital services rendered; the term "reasonable cost" was defined under federal standards to correspond to the cost of services *actually* incurred by a hospital provider and otherwise allowable under Medicare.' [Citation.] '[I]n practice[,] hospitals were reimbursed for whatever cost they had incurred. There was little incentive to contain cost or produce needed services efficiently.' [Citation.] [¶] Federal law no longer mandates reimbursement of costs. [Citation.] Federal law now requires 'a substantive result,' not a particular methodology or form of reimbursement. . . . [¶] 'Congress did not purport to instruct the Secretary [of the federal Department of Health and Human Services] *how* to accomplish these substantive goals. That decision is left to the agency.' [Citation.] 'Each State participating in Medicaid has unique, local interests that come to bear. The Secretary must be free to consider, for each State, the most appropriate way for that State to demonstrate compliance' with section 30(A)." (*Santa Rosa, supra,* 25 Cal.App.5th at p. 816.)

20

implicitly precludes private enforcement of [Section 30(A)]," which contains text so broad and nonspecific as to be " 'judicially unadministrable.' "[15] (*Armstrong*, at p. 328; accord, *Santa Rosa, supra,* 25 Cal.App.5th at p. 821 [*Armstrong* "applies equally to proceedings in state as well as federal courts"[16]]; *Sanchez v. Johnson* (9th Cir. 2005) 416 F.3d 1051, 1060 ["The text and structure of § 30(A) simply do not focus on an individual recipient's or provider's right to benefits, nor is the 'broad and diffuse' language of the statute amenable to judicial remedy."].)[17]  Plaintiffs maintain they are not,

[15]  The high court made this holding in a suit brought by providers of Medicaid-funded residential habilitation services advancing a claim akin to that made by plaintiffs—that the Idaho state agency responsible for administering the state's Medicaid-funded health care program had set reimbursement rates for residential habilitation services lower than Section 30(A) allowed.  (*Armstrong, supra*, 575 U.S. at pp. 323–324.)  The district court granted summary judgment to the providers and ordered the agency's administrators to increase the rates.  (*Id.* at p. 324.)  The Supreme Court reversed.  (*Id.* at p. 332.)

[16]  Indeed, as the court in *Santa Rosa* explained, Section 30(A) was revised in the face of reimbursement cost concerns to maximize the Secretary's flexibility and discretion in assessing whether a state plan complies with the Medicaid Act.  (*Santa Rosa, supra,* 25 Cal.App.5th at p. 816.)

[17]  Thus, in *Santa Rosa* the Court of Appeal held hospitals challenging a reduction in reimbursement rates approved by the federal government, could not sue the state or state officials for an alleged violation of Section 30(A).  "[H]ealth care providers alleging a violation of 42 United States Code section 1396a(a)(30)(A) (section 30(A)) may not obtain a writ of mandate against state officials to contest Medicaid rates approved by the federal agency that administers the program.  Their recourse is an administrative action against the federal agency that approved the rates."  (*Santa Rosa, supra,* 25 Cal.App.5th at p. 814.)  While plaintiffs acknowledge that under *Armstrong* and *Santa Rosa*, claims challenging reimbursement rates under Section 30(A) must be brought through the administrative review and mandamus process, they claimed at oral argument that is not a viable option because defendants have allegedly failed to comply with their statutory and

contrary to *Armstrong,* seeking to enforce Section 30(A) but cite the statute only "as an objective of Medi-Cal" for purposes of Regulation 11154 and, specifically, its language barring methods of administration of state-funded programs that have the effect of "defeating or substantially impairing the accomplishment of the objectives of the recipient's program with respect to a person of a particular ethnic group identification. . . ."[18] (Regs., § 11154, subd. (i)(2).)  They cite no authority, however, for the proposition that they can transform the broad and nonspecific, and "judicially unadministrable" language of Section 30(A) into a state plan objective enforceable by state plan beneficiaries through a private right of action under state anti-discrimination laws.[19]  (See *Armstrong,* at p. 328 ["the Medicaid Act implicitly precludes private enforcement of § 30(A), and [Medicaid providers] cannot, by invoking our equitable powers, circumvent Congress's exclusion of private enforcement"].)

---

regulatory rate review obligations and therefore have not requested Medicaid rate approvals that could be challenged.  However, if defendants are failing to comply with such predicate statutory and regulatory duties and obligations (e.g. their alleged duty to periodically review rates under Welf. & Inst. Code, § 14079), they can be compelled to do so through ordinary mandamus.  (Code Civ. Proc., § 1085; *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442 ["Mandamus will lie to compel a public official to perform an official act required by law . . . [and] may issue . . . to compel an official both to exercise his discretion (if he is required by law to do so) and to exercise it under a proper interpretation of the applicable law."].)

[18]  Other than making this assertion, plaintiffs did not in their briefing address *Armstrong* beyond noting in their reply brief that litigation under Section 30(A) "was permissible for years prior to *Armstrong.* . . ."

[19]  We note the amicus brief filed by the National Health Law Program, emphasizes the import of Section 30(A), but argues only that Section 30(A) supports comparison of Medi-Cal physician services beneficiaries with Medi-Cal long-term care beneficiaries (plaintiffs' second posited comparator theory), not with all California residents insured through other plans.

Turning to Welfare and Institutions Code section 14000, it provides in relevant part: "The intent of the Legislature [in enacting the Medi-Cal program] is to provide, to the extent practicable, through the provisions of this chapter, for health care for California residents who lack sufficient income to meet the costs of health care and whose other assets are so limited that their application toward the costs of that care would jeopardize the person or family's future minimum self-maintenance and security.  It is intended that, whenever possible and feasible, all of the following shall apply: [¶] (a) *The means employed shall allow, to the extent practicable, eligible persons to secure health care in the same manner employed by the public generally, and without discrimination or segregation based purely on their economic disability*.  The means employed shall include an emphasis on efforts to arrange and encourage access to health care through enrollment in organized, managed care plans of the type available to the general public." (Welf. & Inst. Code, § 14000, subd. (a), italics added.)

Plaintiffs assert the italicized language is an express "integration provision" that shows the "Legislature intended to compare Medi-Cal [beneficiaries'] access to care to the access of those with other forms of health care insurance."[20]  Again, plaintiffs disregard the plain language of the statute.

---

[20]  The term "integration provision" has been used in connection with title II of the Americans with Disabilities Act (ADA), for example, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  (42 U.S.C. § 12132.)  "Pursuant to this provision, a seminal 'integration mandate' appears in the regulation that requires a 'public entity [to] administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.'  28 C.F.R. § 35.130(d).  In a case brought by two people then

Welfare and Institutions Code section 14000, subdivision (a), contains *qualified* language expressing an intent to allow—"whenever possible and feasible" and "to the extent practicable"—eligible persons to secure health care "in the same manner" as the general public. As the Court of Appeal explained in *California Medical Assn. v. Brian* (1973) 30 Cal.App.3d 637, 642, "It is clear that the legislative intent was to provide 'mainstream' medical care to the indigent. In effect, this meant that poorer people could have access to a private practitioner of their choice, and not be relegated to a county hospital program." (See *Paramount Convalescent Center, Inc. v. Department of Health Care Services* (1975) 15 Cal.3d 489, 497 [basic premise of government-supported health programs including Medi-Cal is "to afford recipients the widest possible choice of qualified care facilities"]; *County of San Diego v. State of California* (1997) 15 Cal.4th 68, 96 [legislative goal to allow Medi-Cal recipients to secure basic health care in same manner as general public means allowing public assistance recipients " 'free choice of

---

institutionalized for mental illness who sought to be discharged to community care facilities, the Supreme Court explored the contours of these rules. For present purposes, it suffices to state that according to [the high court], 'discrimination' occurs when an individual is 'unjustifi[ably]' institutionalized and thereby denied the benefit of the most 'integrated setting' available in the community for which the state's treating professionals deem him suited." (*U.S. v. Mississippi* (5th Cir. 2023) 82 F.4th 387, 391–392, quoting *Olmstead v. L.C.* (1999) 527 U.S. 581, 599–600 (*Olmstead*).) The " 'most integrated setting appropriate' " is the " 'setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible.' " (*Olmstead*, at p. 592.) As the *Olmstead* court also explained, the "integration mandate" does not mean the "ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.' " (*Id.* at p. 603, fn. 14.) Rather, the court held, "States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." (*Ibid.*)

24

arrangements under which they shall receive basic health care' " and ensuring Medi-Cal eligibles could " 'secure health care in the same manner employed by the general public (i.e., in the private sector or at a county facility)' "].)

This understanding—that the intent was, to the extent practicable, to enable Medi-Cal beneficiaries to procure basic health care at facilities other than county hospitals—is supported by the legislative history. When the Legislature enacted the Medi-Cal Act in 1965, it declared, through a prefatory statement of intent, that its purpose was to "afford *basic* health care and related remedial or preventive services to recipients of public assistance and to medically indigent aged and other persons, including related social services which are necessary for those receiving health care under this chapter." (Stats. 1965, 2d Ex. Sess., ch. 4, § 2, p. 103, italics added.) The Legislature further declared that "After December 31, 1966, such care shall, to the extent feasible, be provided through a system of prepaid health care or contracts with carriers." (*Id.* at p. 104.) In addition, subdivision (b) of section 14000 of the Welfare and Institutions Code as enacted included language similar to that appearing in subdivision (a) today and stated, "The means employed shall be such as to allow eligible persons to secure *basic* health care in the same manner employed by the public generally, and without discrimination or segregation based purely on their economic disability." (Stats. 1965, 2d Ex. Sess., ch. 4, § 2, p. 104, italics added.) Subdivision (d) of section 14000 of the Welfare and Institutions stated, in turn, "In the administration of this part and in establishing the means to be used, the department shall give due consideration to the appropriate organization and to the ready accessibility and availability of the

25

facilities and resources for basic health care and extended health services to persons eligible. . . ." (Stats. 1965, 2d Ex. Sess., ch. 4, § 2, p. 104.)

Thus, read together and in context, the original statutory text explained that *basic health care* would be provided *to the extent feasible* through a prepaid system or contracts with carriers, *with due consideration* given to the facilities and resources available for such care. Nothing in the language suggests that when the Legislature established the Medi-Cal program it contemplated, let alone mandated, that Medi-Cal would provide beneficiaries with the same coverage and provider options other state residents might have through other health insurance plans.

The Legislature amended Welfare and Institutions Code section 14000 in 1991 to facilitate the transition of the Medi-Cal program to providing services through managed care.[21] (Stats. 1991, ch. 95, § 1, pp. 496–497.) The legislation was an urgency measure resulting from budget negotiations that sought to increase the emphasis on managed care arrangements for Medi-Cal beneficiaries, improve access to medical care, and reduce costs for the state by providing for more cost-effective health delivery systems than fee-for-service provider care. (See, e.g., Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 336 (1991–1992 Reg. Sess.) June 15, 1991, p. 1; Governor's Off. of Planning and Research Enrolled Bill Rep. on Assem. Bill No. 336 (1991–1992 Reg. Sess.) June 28, 1991, pp. 1, 3.) The amendment added language regarding the means employed to secure health care which remains in the statute today: "The means employed shall include an emphasis on efforts to arrange and encourage access to health care through enrollment in

---

[21] During the 1980s and 1990s, Medicaid programs throughout the country moved away from the traditional fee-for-service model for delivery of health care services and toward managed care models. (*Keffeler, supra,* 224 Cal.App.4th at pp. 328–330.)

organized, managed care plans of the type available to the general public." (Stats. 1991, ch. 95, § 1, p. 496; Welf. & Inst. Code, § 14000, subd. (a).)

Thus, as the Legislative Counsel's Digest stated, whereas existing law required the DHCS "whenever possible and feasible, to give due consideration to the appropriate organization and the ready accessibility and availability of the facilities and resources for health care to eligible persons, and to new and innovative approaches to the delivery of health care services," the new law would "instead, require the department to emphasize and take advantage of the efficient organization and ready accessibility and availability of health care facilities through enrollment in managed care arrangements and new and innovative fee-for-service managed care approaches to the delivery of health care services." (Leg. Counsel's Dig., Assem. Bill No. 336 (1991–1992 Reg. Sess.) 4 Stats. 1991, Summary Dig., p. 48; see Dept. of Health Services, Health & Welfare Agency, Enrolled Bill Rep. on Assem. Bill No. 336 (1991–1992 Reg. Sess.) June 27, 1991, p. 1 ["Over the years, managed care has become the manner in which the public generally received medical care; however, the State's ability to provide Medi-Cal services through managed care has lagged. The managed care initiative proposed by Governor Wilson is intended to remedy this situation."].)

Thus, the subsequent history reflects the Legislature's continued concern with the manner in which health care services are delivered to beneficiaries. It does not, in any case, indicate an intent to now mandate that the Medi-Cal program provide the same coverage and same provider options that may be available to other state residents through other health plans.

Plaintiffs argue the Legislature's intent as expressed in Welfare and Institutions Code section 14000, subdivision (a) is analogous to the goals of the Fair Housing Act (FHA; 42 U.S.C. § 3601 et seq.) as articulated in

27

implementing regulations that proscribe housing practices that have the "segregative effect" of harming the community by increasing, reinforcing, or perpetuating segregated housing patterns.  These federal regulations provide in pertinent part, "Liability may be established under the Fair Housing Act based on a practice's discriminatory effect, as defined in paragraph (a) of this section. . . . [¶] . . . A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." (24 C.F.R. § 100.500(a); 78 Fed.Reg. 11460, 11482 (Feb. 15, 2013); 88 Fed.Reg. 19450, 19454 (Mar. 31, 2023).)

It has long been recognized that actionable discrimination under the FHA can be proved under intentional and disparate impact (or "disparate effect") theories and that the latter theory embraces both traditional disparate impact and perpetuation of segregative-effect claims.  (See generally Schwemm, *Segregative-Effect Claims Under the Fair Housing Act* (2017) 20 N.Y.U. J. Legis. & Pub. Pol'y 709, 713 (hereafter Schwemm II); Schwemm & Bradford, *Proving Disparate Impact in Fair Housing Cases After Inclusive Communities* (2016) 19 N.Y.U. J. Legis. & Pub. Pol'y 685, 690–691 (hereafter Schwemm I.)  As Professor Schwemm, a widely acknowledged scholar in this area, has explained, "HUD's [[Department of Housing & Urban Development)] regulation endorsing discriminatory-effect claims under the FHA recognizes that a challenged practice may have an illegal effect in either of two ways: '(1) harm to a particular group of persons by a disparate impact; and (2) harm to the community generally by creating, increasing, reinforcing, or perpetuating segregated housing patterns.' " (Schwemm II, at p. 713.)  "Most segregative-effect claims have been made

28

against municipalities accused of using their land-use powers to block integrated housing developments in predominantly white areas. Unlike disparate-impact claims, segregative-effect claims may challenge a particular action or decision of the defendant as well as an across-the-board policy. Moreover, segregative-effect claims focus on the harm done to the local community, whereas disparate-impact claims focus on the harm done to a racial minority or other FHA-protected class." (*Ibid.,* fns. omitted.)

Thus, as Schwemm goes on to discuss, a segregative-effect claim involves either a single land-use denial or adoption of a constrictive land-use policy that impacts the supply of housing within *a defined community*. It is not a theory that permits unbounded comparison to the general public. "In impact cases, the focus is how the defendant's challenged policy affects protected versus non-protected classes in the market area for the housing at issue. The geographic focus in segregative-effect cases is often a smaller area. . . . Indeed, HUD's articulation of the segregative-effect theory speaks in terms of a 'community' being injured, not a protected class as in impact claims. This language implies that the proper focus in a segregative-effect claim is limited by the boundaries of this harmed community."[22] (Schwemm II, *supra,* 20 N.Y.U. J. Legislation & Public Policy at p. 738, fns. omitted.)

Plaintiffs assert "Healthcare, like housing, is capable of desegregation—for example, by setting reimbursement rates at levels adequate to allow Medi-Cal participants to see the same physicians as everyone else in the same geographic area. . . ." They cite no authority,

---

[22] The final amended regulations implementing section 11135 include language nearly identical to the FHA regulation. We have no occasion in the instant case to expound on the meaning of the amended regulatory language, but presumably it has the same import Professor Schwemm has discussed in connection with the pertinent FHA regulation.

however, that supports their contention that the Legislature's intent with regard to the Medi-Cal program was, and is, to create a health care program providing beneficiaries the same benefits and access to providers as may be provided to other California residents under other health care plans in the same way desegregation of entrenched discriminatory housing patterns within a community is a goal of the FHA.

In *Villafana, supra,* 57 Cal.App.5th at page 1019, the court rejected a similar effort to support a disparate impact claim under section 11135 by analogizing to the FHA. The court explained that beyond prohibiting discrimination, "the Fair Housing Act aims to promote integrated housing patterns and prevent the increase of segregation in the general population." (*Villafana,* at p. 1019.) Because the law was intended to impact not only those who fall within protected classes but also the broader population, "demographic statistics within the general population could serve as an appropriate measure for comparison" in stating a disparate impact claim. (*Ibid.*) But "Welfare benefits are not distributed with the express aim of affecting those who do not qualify for them in the same way that the Fair Housing Act does." (*Ibid.*) So, too, the Medi-Cal program was not intended to impact *both* "those who fall within protected classes" and "also . . . the broader population." (*Ibid.*; see *Jackson v. Stockdale* (1989) 215 Cal.App.3d 1503, 1514 ["express purpose of the Medi-Cal Act is to afford necessary health care to needy persons and, where feasible, to provide that care without discrimination or segregation on the basis of economic disability"].)

Plaintiffs also argue precedent in the disability context supports a comparison between the disproportionately Latino population of Medi-Cal beneficiaries and the disproportionately White population having other forms of health care insurance. Relying primarily on *Davis v. Shah* (2d Cir. 2016)

821 F.3d 231, 260–262 and footnote 21 (*Davis*), plaintiffs maintain Medi-Cal's supposed "integration provision"—that is, Welfare and Institutions Code section 14000, subdivision (a)—is analogous to integration provisions in title II of the ADA and in section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794).

*Davis* involved amendments to New York's Medicaid plan that restricted coverage for orthopedic footwear and compression stockings to a narrow set of medical conditions, effectively denying disabled persons access to medically necessary care and putting them at risk of institutionalization. (*Davis, supra,* 821 F.3d at p. 261.) As the circuit court explained, "Both Title II of the ADA and § 504 of the Rehabilitation Act protect the rights of disabled individuals to participate in state-administered or funded services" and prohibit excluding a disabled individual from participating in or being denied the benefits of services, programs or activities of a public entity or being subjected to discrimination by such entity. (*Davis,* at p. 259; *Olmstead, supra,* 527 U.S. at pp. 599–600.) In addition, federal regulations required public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." (28 C.F.R. §35.130(d).) The court therefore concluded the plaintiffs could assert a disparate *treatment* claim based on the exclusion of disabled individuals from services *provided by the program* on the basis of their protected status. (*Davis,* at pp. 259–264 & fn. 18.) Neither the federal regulation at issue in *Davis,* nor any language of the opinion, supports plaintiffs' assertion that they can base a disparate *impact* claim on differences in coverage and provider options available to Medi-Cal beneficiaries and to participants in other health care plans.

Nor are we persuaded that *Linton by Arnold v. Carney by Kimble* (M.D.Tenn. 1990) 779 F.Supp. 925 (*Linton*), advances plaintiffs' case. In *Linton,* indigent patients sued the State of Tennessee to enjoin an unwritten state policy that allowed nursing homes to limit the number of beds in their facilities available for Medicaid patients. Thus, the policy allowed nursing home operators "to give preference to private pay patients by reserving for their exclusive use beds which [were], due to lack of certification, unavailable to Medicaid patients." (*Id.* at pp. 927, 932.) The federal district court concluded the policy violated Medicaid statutes and regulatory provisions. (*Id.* at pp. 932–934.)

It also concluded the plaintiffs had shown the policy had a disparate impact on racial minorities and violated title VI. (*Linton, supra,* 779 F.Supp. at p. 935.) The court's disparate impact analysis is less than clear. It found the state's Medicaid program had a disparate and adverse impact on minorities because (1) "the higher incidence of poverty in the black population, and the concomitant increased dependence on Medicaid" meant "a policy limiting the amount of nursing home beds available to Medicaid patients will disproportionately affect blacks," (2) blacks comprised 39.4 percent of the Medicaid population but accounted for only 15.4 percent of those Medicaid patients able to gain access to Medicaid-covered nursing home services, and (3) the statewide system of licensed nursing homes, "70 percent funded by the Medicaid programs, serves whites[,] while blacks are relegated to substandard boarding homes which receive no Medicaid subsidies." (*Id.* at p. 932.) The court did not use or discuss the now well-established analytical framework applicable to disparate impact claims, let alone discuss the requirement that "An appropriate statistical measure must . . . take into account the correct population base and its racial makeup."

32

(*Darensburg*, *supra*, 636 F.3d at p. 520; *Villafana, supra,* 57 Cal.App.5th at p. 1018 [same].) It is also apparent the state's policy discriminated *among* Medicaid nursing home beneficiaries on the basis of race and resulted in discriminatory access to *a Medicaid service.* We also note that the district court's conclusion that the unwritten policy violated federal law was, in considerable respect, contrary to then-recent amendments to the Medicaid Act. (See *Heritage House of Salem, Inc. v. Bailey* (Ind. Ct.App. 1995) 652 N.E.2d 69, 78–79 & fn. 18 [discussing changes to Medicaid nursing home regulations].)

***Comparator Group 2: Long-term Care Medi-Cal Beneficiaries***

Plaintiffs' second posited comparator group consists of Medi-Cal beneficiaries utilizing long-term care. Specifically, they claim the state's methods of administering Medi-Cal have a disproportionate effect on Latino "physician services" participants as compared to "long-term care" participants of whom a greater percentage are White. They assert long-term care beneficiaries are an appropriate comparator group for physician services beneficiaries because both services are part of the Medi-Cal program, both are administered by the DHCS, and both are subject to the same federally approved state Medicaid plan. These generic commonalties are not sufficient to make Medi-Cal long-term care participants a viable comparator group.

Plaintiffs' own allegations in support of this disparate impact theory are that *different* policies and practices, and specifically different funding and reimbursement policies and practices, apply to physician services and long-term care services. Plaintiffs allege, for example, that, "While Defendants have repeatedly cut or held flat physician and clinician reimbursement rates in Medi-Cal, at least one other service paid for by Medi-Cal and overseen by Defendants has consistently seen rate increases over the same period: long-

33

term care." They further allege, "Defendants implement automatic rate increases for long-term care that do not exist for physician services. Defendants spell this out in the state plan for Medi-Cal, which sets forth the methodology by which Defendants automatically update long-term care reimbursement rates. As a result, long-term care rates have steadily increased while physician payments have stagnated."

Plaintiffs' assertion that *different* policies and practices apply to physician services and to long-term care services is also accurate. Long-term care, for example, is governed by the Medi-Cal Long-Term Care Reimbursement Act (Welf. & Inst. Code, § 14126), which sets forth facility-specific rate-setting methodology that is subject to federal approval and the availability of federal funds, and that is based on costs and staffing levels associated with quality of care for residents of nursing facilities as defined in Health and Safety Code section 1250.[23] (Welf. & Inst. Code, §§ 14126.02, subds. (a), (b), 14126.021, 14126.025; see generally, *Crestwood, supra,*

---

[23] In *Crestwood Behavioral Health, Inc. v. Baass* (2023) 91 Cal.App.5th 1, 11 (*Crestwood*), the court discussed the impetus for the Medi-Cal Long-Term Care Reimbursement Act, stating that, "Prior to 2004, providers received a fixed amount per patient per day that provided 'no incentive for quality care while reimbursing [them] about $5[,]000 a year less than it costs to care for these residents.' (Assem. Conc. Sen. Amends. to Assem. Bill No. 1629 (2003–2004 Reg. Sess.) as amended Aug. 24, 2004, p. 6.) The Legislature adopted the Medi-Cal Long-Term Care Reimbursement Act (Reimbursement Act) in September 2004. (See [Welf. & Inst. Code,] §§ 14126–14126.035.) The purpose of the Reimbursement Act was to devise a Medi-Cal reimbursement methodology that 'more effectively ensures individual access to appropriate long-term care services, promotes quality resident care, advances decent wages and benefits for nursing home workers, supports provider compliance with all applicable state and federal requirements, and encourages administrative efficiency.' ([*Id*.,] § 14126.02, subd. (a).)"

91 Cal.App.5th at pp. 11–12 [discussing the statutory and regulatory provisions governing reimbursement for long-term care services].) Long-term care is also separately funded (Welf. & Inst. Code, § 14126.033, subd. (c)(1)), and subject to a detailed and lengthy regulatory scheme outlining the reimbursement methodology.[24] (Cal. Code Regs., tit. 22, § 52000 et seq.; *id*., §§ 52500–52516.)

In short, plaintiffs have not identified a facially neutral funding policy or administrative practice that applies to *both* beneficiaries utilizing physician services and to beneficiaries utilizing long-term care services, making the latter a viable comparator group.[25]

Despite relying on the *differences* in funding and reimbursement of physician services and long-term care services to show "disparity" in the funding and reimbursement of these two categories of service, plaintiffs maintain these differences are "immaterial" when it comes to identifying a viable comparator group because both service categories are subject to "the

---

[24] Plaintiff's amici curiae, National Health Law Program et al., identify additional differences in the funding and reimbursement of long-term care services. (E.g., 42 U.S.C. § 1396a(a)(13)(A) [agencies must use public process when setting reimbursement rates for nursing facility services]; 42 C.F.R. §§ 447.272, 447.321 [Medicaid regulations place upper payment limit on supplemental payments to long-term care facilities].)

[25] Plaintiffs requested judicial notice of a Medi-Cal update bulletin outlining the Medi-Cal reimbursement rate calculation and review process for long-term care, documents from the State Plan published on the DHCS website (which include Medi-Cal State Plan Attachment 3.1-A, Medi-Cal State Plan Attachment 4.19-D, and Medi-Cal State Plan Supplement 4 to Attachment 4.19-D, dictionary definitions of the terms "objective" and "aspiration," and section 4.1 of the State Plan certifying compliance with Section 30(A)). Because these materials largely pertain to *differences* between the physician services and long-term care categories, they are unnecessary to our disposition and we deny these requests for judicial notice.

35

same material policies around rate setting." In support of this general assertion, they cite to the State Plan's identification of physician services and long-term care services as categories of Medi-Cal services and recycle their argument that Section 30(A) and Welfare and Institutions Code section 14000, subdivision (a)—which they claim "specifically peg access in Medi-Cal to that available to the general insured population"—apply to both physician services and to long-term care services. That physician services and long-term care services are both categories of Medi-Cal do not alter the fact they are, as plaintiffs' allegations acknowledge, funded and managed differently, particularly with respect to reimbursement rates. Nor, as we have discussed do Section 30(A) and Welfare and Institutions Code section 14000, either separately or collectively, provide a basis for a discrimination claim based on the failure to provide beneficiaries with the same services that may be provided to other state residents under other health care plans.

Plaintiffs also cite to *Whitfield v. Oliver* (M.D.Ala. 1975) 399 F. Supp. 348, 350–352, for the proposition that "distinct aspects of the same program" can be a basis for a disparate impact comparison. *Whitfield* was an equal protection case in which the court examined whether the plaintiffs' evidence pertaining to the state's application of different reduction factors to two categorical assistance programs was sufficient to require strict scrutiny, rather than rational basis, review. (*Id.* at pp. 350–352.) The court concluded disparities in the funding of the predominantly Black Aid to Needy Families with Dependent Children program as compared to the predominantly White Old Age Assistance program, along with abundant evidence of racially-based discriminatory intent, violated equal protection. (*Id.* at pp. 350–357.) The court did not address the analytical framework applicable to disparate impact claims, let alone identify a viable comparator group within that framework.

(*Id.* at pp. 350–352.)  Accordingly, *Whitfield* is of no assistance on the issues before us.

Southwest Fair Housing Council, Inc. v. Maricopa Domestic Water Improvement District (9th Cir. 2021) 17 F.4th 950 (*Maricopa*), is also distinguishable.  In *Maricopa*, customers in a public housing complex, who were disproportionately African-American, Native American, and single mothers, challenged the local water district's policy of charging a higher security deposit to the 20 households residing in the housing complex than was charged to households residing in non-public housing.  (*Id.* at pp. 955–956.)  The district served, in total, approximately 300 households.  (*Ibid.*)  The trial court concluded the appropriate comparator group consisted of nonprotected-group members residing in the one public housing complex (*id.* at pp. 963–964) and ruled the plaintiffs failed to make a sufficient showing to proceed on a disparate impact claim.  (*Id.* at p. 959.)  Nor had they adduced sufficient evidence to raise a triable issue of disparate treatment.  (*Ibid.*)  The Ninth Circuit concluded that while the plaintiffs had identified a viable comparator group, i.e., "the [d]istrict's public housing and non-public housing residents," the district demonstrated it had a legitimate reason to adopt the two-tier rate structure and the plaintiffs raised no triable issue of pretext.  (*Id.* at pp. 963–964, 972.)  With respect to the comparator group, the circuit court observed, "When a defendant makes a deliberate choice to subject only a subset of its customers or constituents to a certain policy, it is proper to compare the demographics of that subset to the larger population of clients to which the policy does not apply to discern whether the decision to limit a policy to that subset produced any disproportionate effect."  (*Id.* at p. 963.)

Plaintiffs emphasize the *Maricopa* court's general observation that "There are multiple valid methods of analysis involving different comparative

populations." (*Maricopa, supra,* 17 F.4th at p. 963.)  However, the circuit court was also careful to point out that a policy which is "generally applicable and that does not explicitly apply only to a subset based on a particular characteristic may require a different analysis or consideration of idiosyncratic factors to isolate the 'affected' population." (*Id.* at p. 963, fn. 10; see generally Schwemm I, *supra,* N.Y.U. J. Legis. & Pub. Pol'y at pp. 697–709 [discussing the unique challenges in using statistical evidence and identifying comparator groups in FHA disparate impact cases].)  In any case, in *Maricopa, all* customers were subject to a security deposit; the only difference was that the district charged a fractional sub-set of its already small customer base more. (*Maricopa,* at p. 958.)

Here, in contrast, there is no such commonality within so confined a population.  As we have discussed, physician services and long-term nursing services are different categories of service, governed by different and detailed statutory and regulatory provisions, including with respect to funding and reimbursement for services.

### Comparator Group 3: Past Medi-Cal Beneficiaries

Plaintiffs' third posited comparator group consists of "past" Medi-Cal beneficiaries who accessed physician services.  Specifically, plaintiffs alleged defendants' "disinvestment disparately impacts Medi-Cal participants today, who are overwhelmingly and disproportionately Latino, as compared to Medi-Cal participants in the past, who were significantly less Latino.  [¶] . . . This disinvestment has built upon and perpetuated past discrimination, when rates were set arbitrarily low as the share of Latino participants rapidly grew."  "When Latinos were not such a large proportion of participants,

38

reimbursement rates were higher and more reflective of the costs of providing care, and participants had much better access to health care."

To begin with, these conclusory allegations do not adequately define a comparator group. The generic terminology "past" Medi-Cal beneficiaries is insufficient to identify the comparative population. Plaintiffs allege, for example, that "disinvestment" "built upon and perpetuated past discrimination." The obvious question then is how far into the "past" must one reach to discern the posited comparator group of less-discriminated against, or non-discriminated against, beneficiaries. Plaintiffs provide no adequate answer. They point out that in their third amended complaint they included a graph allegedly showing a "Medicaid fee index," which compares Medicaid fee-for-service payments for "All services" and a "Medicare Fee Index" for "Primary care" between 1979 and 2017, and the rise of the Latino share of Medi-Cal's population during the same period. They similarly alleged "Access to care for Medi-Cal participants has worsened during the *relevant time period*" because, "For example, *from the early 2000s to 2016*, Medi-Cal participants became much more likely not to have a usual source of care other than an emergency room, and to have had *no* visits with physicians in the preceding 12 months." (First & second italics added, third italics in original.) None of this adequately defines a comparator group of "past" Medi-Cal beneficiaries who received physician services.

In addition, plaintiffs failed to allege that "current" and "past" physician services beneficiaries have been subject to the same facially neutral policies and practices so as to make "past" physician services beneficiaries a viable comparator group. To the contrary—they allege the state's funding and Medi-Cal policies have changed drastically over time. Plaintiffs allege, for example, that "in the past" defendants' "reimbursement rates were higher

39

and more reflective of the costs of providing care," that the Legislature has repeatedly cut reimbursement rates for Medi-Cal over the past 40 years, impacting fee-for-service and managed care alike, that reimbursement rates have thus been permitted to stagnate over this period of time, and that current physician services beneficiaries are now severely impacted by the Legislature's and defendants' "disinvestment" in the Medi-Cal program. Thus, plaintiffs' own allegations show, as the defendants argued below and as the trial court concluded, "the former Medi-Cal basic health plan and the current Medi-Cal basic health [plan] cannot be compared [because they] are not part of the same neutral policy or procedure."

Plaintiffs maintain these differences are immaterial because the fee-for-service rate-setting provision has remained essentially unchanged since 1992 and "relevant portions" of the managed care rate-setting statute have been in effect since the 1970s. They acknowledge "more specific requirements" for managed care rate-setting have been put in place since that time but assert these provisions "simply flesh out requirements that had been in effect since 1977." Again, plaintiffs cannot have it both ways. Their pivotal allegations are that Medi-Cal's current beneficiaries utilizing physician services are negatively impacted by *changes* in the state's funding level and defendants' administration of the program *over the past four decades,* as compared to some unspecified time in "the past."

Plaintiffs' reliance on *The Committee Concerning Community Improvement v. City of Modesto* (9th Cir. 2009) 583 F.3d 690 (*CCCI*), is misplaced. In *CCCI,* plaintiffs, residents of predominantly Latino unincorporated neighborhoods outside the city of Modesto sued the city for a number of alleged discriminatory acts, including, excluding the neighborhoods from a Master Tax Sharing Agreement (MTSA), which

40

plaintiffs maintained constituted a barrier to annexation erected by the city and county, leaving the residents without comparable government services. (*Id.* at pp. 696, 699, 703.)  The district court granted summary judgment for the city on the plaintiffs' MTSA claim.  The circuit court reversed, concluding the evidence raised a triable issue of *intentional* discrimination in connection with their equal protection and title VI claims.  (*CCCI,* at pp. 700, 702–705.) This evidence included statistical evidence, including historical census data, about the ethnicities of the populations in the neighborhoods included and excluded from the MTSA.  (*Id.* at pp. 703–704.)  It additionally included evidence of actions by the city under the MTSA that arguably supported an inference of intentional discrimination against Latino majority excluded neighborhoods.  (*Id.* at p. 705.)  Specifically, the circuit court considered this evidence in applying the intentional discrimination analytical framework of *Arlington Heights, supra,* 429 U.S. at pages 267–268, which allows a court to consider, "In addition to statistical evidence showing discriminatory impact," other factors to determine intent, including "the historical background of the decision, the sequence of events leading up to the decision, and any relevant legislative or administrative history."[26]  (*CCCI*, at p. 703.)

---

[26] The plaintiffs in *CCCI* also alleged a disparate impact claim under section 11135 as to which the district court granted summary judgment on statute of limitation grounds.  The district court declined to alternatively grant summary judgment on the merits, stating there was some evidence of disparate impact.  (*The Committee Concerning Community Improvement v. City of Modesto* (E.D.Cal., May 16, 2007, No. CV-F-04-6121 LJO DLB) 2007 WL 1456142, at pp. *18–20).  The circuit court reversed the district court's statute of limitations ruling and remanded for the lower court to determine whether to exercise supplemental jurisdiction over the state law claim.  The circuit court did not address the substance of the claim or engage in any discussion of the analytical framework applicable to a disparate impact claim. (*CCCI, supra*, 583 F.3d at pp. 705, 715.)  While it appears the district court may have retained supplemental jurisdiction, no further merits order was

We also observe that *CCCI,* like *Maricopa,* involved one practice adopted at one time which applied to one regional population area. (*CCCI, supra*, 583 F.3d at pp. 702–703; *Maricopa, supra*, 17 F.4th at p. 956.) Again, there is no such commonality here. Plaintiffs' third posited comparator group theory seeks to compare not only undefined "current" and "past" Medi-Cal physician services beneficiaries, but their discrimination claims turn on alleged *differences* in how Medi-Cal was funded and managed "then," and how it is funded and managed "now." This is not a viable disparate impact comparison.

Plaintiffs also cite to Regulation 11154, subdivision (i)(3), which they point out states it is a discriminatory practice for a recipient, in carrying out a state-funded program, "(i) to utilize criteria or methods of administration that: [¶] . . . [¶] (3) perpetuate discrimination by another recipient on the basis of ethnic group identification, religion, age, sex, color, or a physical or mental disability." Plaintiffs made no mention of this subdivision in their third amended complaint. It also has no application. The state has always

issued by the court. (See *The Committee Concerning Community Improvement v. City of Modesto* (E.D.Cal. Aug. 27, 2010, No. CV-F-04-6121 LJO DLB) 2010 U.S. Dist. LEXIS 95052, at pp. *6, *18 [Post-remand order on a motion to file a fourth amended complaint stating, "On June 18, 2010, in remanded proceedings, this Court exercised its discretion for supplemental jurisdiction and reinstated the state law claims previously dismissed, including the claim for alleged violation of [the Fair Employment and Housing Act]," and further observing the plaintiffs' proposed fourth amended complaint did not comply with the Ninth Circuit ruling.].) We also note that the circuit court's opinion in *CCCI* predated by six years the United States Supreme Court's decision in *Inclusive Communities* holding that while disparate impact claims can be brought under the FHA, some care must be taken in the use of raw statistical disparities to "protect[] defendants from being held liable for racial disparities they did not create." (*Inclusive Communities, supra,* 576 U.S. at p. 542.)

funded and administered the Medi-Cal program. Thus, there has been no prior "recipient" of these state funds whose alleged discrimination the state is now allegedly "perpetuating." We also observe that plaintiffs' complaint of "perpetuating" discrimination is seemingly at odds with the premise of their third comparator group theory—that at some undefined earlier time Medi-Cal reimbursement rates were adequate and *not* discriminatory, but in ensuing years, the state and defendants *commenced* discriminating. In other words, instead of being predicated on a claim of *perpetuating* historic and entrenched discrimination (or, as used in connection with the FHA, a claim of perpetuating segregative effect), plaintiffs' third comparator group theory is predicated on the commencement of and adherence to allegedly discriminatory conduct.

Plaintiffs also cursorily cite to, but provide no developed argument with respect to, Welfare and Institutions Code section 14000.1, which states, "It is the intent of the Legislature that health care services available under this chapter shall be at least equivalent to the level provided in 1970–71." This statute also does not advance their disparate impact claims.

In *Morris v. Williams* (1967) 67 Cal.2d 733 (*Morris*), our Supreme Court discussed the significance of the predecessor version of this statute which stated the Legislature intended " 'that the scope and duration of health services under this chapter and Chapter 8 (commencing with Section 14500) shall be at least equivalent to the level provided in 1964–65 under public assistance programs.' " (*Id*. at pp. 740–741, quoting Welf. & Inst. Code, former § 14000.1.) The statute was enacted as part of the original Medi-Cal Act, at which time the Legislature did not have sufficient data to predict the costs of the program but did have aspirations as to the extent of services it would provide. Within two years, the state faced budget problems and could

not appropriate funds to the program equivalent to those appropriated in 1964–1965. (*Morris,* at p. 744.) The Medi-Cal administrator enacted emergency regulations to address the shortfall and reduce services. (*Ibid.*) The trial court found, and the high court agreed, that some of the administrator's actions violated specific provisions of the Medi-Cal Act, but not Welfare and Institutions Code section 14000.1. (*Morris*, at p. 761.)

The Supreme Court explained that the administrator was "empowered to spend no more than the appropriated amount. His authority must therefore be measured by the annual budgetary provisions. [Welfare and Institutions Code] [s]ection 14000.1, by contrast, contains no mandate directed to the Administrator that defines his spending power. Rather, that section is directed to future Legislatures informing them of a principal long-term goal of Medi-Cal founders. The 1965 Legislature, of course, could not bind its successors and did not intend to do so. Nothing in [Welfare and Institutions Code] section 14000.1 prevents the 1967 Legislature from establishing different goals or modifying old ones to accord with fiscal realities." (*Morris, supra,* 67 Cal.2d at p. 749.) In response to the plaintiffs' argument that in the urgency budgetary legislation the Legislature had reaffirmed "the objective of [Welfare and Institutions Code] section 14000.1 by expressing the Legislature's 'contemplation' that Medi-Cal 'be permitted to operate at its present [1966–67] level,' " the high court explained the Legislature also "clearly contemplated that program reductions may be necessary to meet fiscal limitations." (*Ibid.*) "To focus on the precatory language of the urgency clause," said the court, "is to miss the central impact of the act: that the limited appropriation may compel program cuts that would necessarily reduce the 1966–67 level." (*Id.* at pp. 749–750.)

44

Thus, while Welfare and Institutions Code section 14000.1 may articulate a legislative goal, it imposes no funding mandate on any subsequent Legislature, let alone, any Medi-Cal administrator.  Nor does it remotely suggest that a disparate impact discrimination claim can be predicated on asserted differences between current budget allocations and those in 1970–1971.  In short, Welfare and Institutions Code section 14000.1 does not substitute for the lack of a facially neutral policy or practice that applies to *both* plaintiffs and the posited comparator group of "prior" physician services beneficiaries which disproportionately impacts plaintiffs more negatively than it does the comparator group.[27]

## DISPOSITION

The judgment is affirmed.  Defendants to recover costs on appeal.

---

[27] In addition to the materials we have already noted and discussed, the parties requested that we take judicial notice of a variety of other materials.  We have carefully considered these requests and the attached materials but conclude, in light of our analysis and the controlling case law, none of them are material to our disposition.  We therefore deny all pending requests for judicial notice.

45

_____
Banke, Acting P. J.

We concur:

_____
Stewart, J.

_____
Langhorne Wilson, J.

A165963, *Perea v. California Department of Health Care Services*

46